*In re* FERRIS' ESTATE.

BURGESS *v.* JOY.

WILLS—MENTAL INCAPACITY—EVIDENCE—UNDUE INFLUENCE.

In probate proceedings, *held*, on review of conflicting evidence, that the will was valid and the testator understood the nature and effect of his act; also, *held*, that the instrument expressed the will of testator and was not shown to have been procured by undue influence.

Error to Jackson; Parkinson, J. Submitted January 18, 1916. (Docket No. 119.) Decided March 31, 1916.

Calista Burgess presented for probate the will of Lewis Ferris, deceased. From an order admitting the same to probate contestants, Clarissa Joy and others, appealed to the circuit court. Judgment for proponent upon a verdict directed by the court. Contestants bring error. Affirmed.

*Wilson & Cobb,* for appellants.

*Price & Whiting,* for appellee.

OSTRANDER, J. When a paper purporting to be the last will and testament of Lewis Ferris was offered for probate in the probate court for Jackson county, two sisters, a brother, and certain nieces and nephews of the testator made objection. The objections, briefly stated, were that Lewis Ferris was mentally incompetent to understand the extent of his estate and his relations to relatives and friends when the paper was executed, was unduly influenced to make and execute it by Charles J. Comstock, named as executor therein, and by a sister and her husband with whom he was living, was of unsound mind, and the execution of the paper and the making of it was brought about by the undue influence and fraud practiced by these persons. In the probate court no contest was made, and the paper was proved and admitted to probate. The contestants appealed, repeating in the notice of appeal the objections above stated. Apparently, the matter was once heard in the circuit court for Jackson county without final result, and the trial now sought to be reviewed began December 2, 1912, and resulted in a verdict for proponent, directed by the court. Judgment was entered on the verdict. Contestants, asserting that questions for the jury were raised by the testimony, have removed the record to this court.

The will, executed October 17, 1908, seven days before the testator died, is a simple one.

Leroy Ferris, a contestant, testified that:

"The will divides the property into sevenths, in accordance with the number of brothers and sisters of the whole and half blood, except it wills two shares to a life estate and gives four $3,000 legacies to the children of William and Calista Burgess. Aside from those legacies, the property is divided among those who would naturally be the objects of his bounty."

After payment of debts and funeral charges, the estate is made to devolve as follows: To a niece, Mrs. Edith Robbins, a daughter, and to each of three nephews, sons of Calista Burgess, a sister of testator, the sum of $3,000 is given, the remainder of the estate is divided into seven parts or shares, and one part or share, or the income therefrom, is given to each of the testator's brothers and sisters, including Calista Burgess, and to the children of a deceased sister. The share given to a half-brother, Leroy E. Ferris, and that given to the children of a half-sister, Ida Sellen, are, in form, in trust, the income to be paid to the beneficiaries during life. A trustee is nominated to execute the trusts. The gifts to all others are unqualified. No final disposition is made of the funds of the trust estates. The executor is empowered to sell and convey property, real and personal, at public or private sale, and to settle and compromise all claims for and against the estate, and the probate judge directed to allow the executor "a compensation adequate and commensurate with my said estate, as extraordinary compensation beyond what is allowed by the statutes."

Assuming that the contestants are not moved entirely by altruistic motives, and are governed in some degree by the desire to profit by an order refusing probate of the will, it would seem that in the preference of the Burgess family by the testator and the

creation of the two trust estates may be found the cause for this litigation.

The testator was a bachelor, 70 years old, who had lived at various places in and around Springport, in Jackson county, for many years, perhaps for the greater part of his life. In health—and he appears to have enjoyed health for the most part—he is described as a man physically robust, large, honest, kind-hearted, with a fairly active mind, a capacity for such business as he carried on, but somewhat slow in reaching business conclusions. It is not contended that he was ever mentally deficient, unbalanced, or incompetent, until near the end of his life, when for more than a year, and perhaps for two years, he suffered from a progressive and incurable disease. Two physicians, the ability of neither being questioned, attended him, and they call the disease progressive anemia. One of them, who lives at a distance from Springport, and had many times been consulted by him, saw testator October 15th and again on a day after the will was executed. The other saw him daily, and often several times a day, before and after the will was executed, and was present for a short time when the scrivener and nominated executor was securing from testator, as he says, data for preparing the will. Neither physician questions the mental capacity of testator to make the will on the day it was executed. Quite the contrary. They agree in saying that testator's disease was progressive and incurable, and that when the will was executed he was, as for several days he had been, a very sick man. The prognosis was death, and a certain symptom, a chill, manifested at least once before October 17th, indicated to the medical mind the beginning of the end. There is much testimony to the effect that for a considerable period before he finally went to bed the testator had at intervals been drowsy, that in conversations he repeated inquiries after they had been answered, and

seemed at times to be rather stupid. Many of his acquaintances noticed his failing condition, and some describe his movements as indicating considerable physical weakness long before he died. But I find no testimony of any instance when he addressed his attention to business, or business affairs, and exhibited a lack of mental integrity.

Two business men of Springport, acquaintances of the testator, were called in by Mr. Comstock to witness the will. Their visit was somewhat hurried, and they, of course, made no effort to test the mental capacity of the testator. The significant circumstance is that they saw and heard nothing which suggested any want of mental capacity of the testator or failure to comprehend what he was doing. There is the instrument bearing the signature of the testator, attested by two witnesses.

The scrivener, who prepared the will and is named executor, is bitterly assailed by counsel for contestants. If the idea that he had an ulterior or sinister purpose is eliminated, all that he did seems natural, innocent, and prompted by friendly feeling towards testator. He and the testator had been acquainted for years. They had together owned and operated a gristmill, depositing money from the business in the bank; each drawing it out on checks signed "Comstock & Ferris." They owned as tenants in common a piece of land, and Comstock, admittedly, wished to acquire the whole title and had sought to do so. Comstock had frequently prepared papers for the testator, who lent money, and there is evidence of mutual respect and trust in their relations and in their opinions of each other. Comstock knew, and testator knew, that testator could not regain his health. If Comstock's testimony is to be believed, the testator had expressed to him the determination that his money should be left to no one to be squandered. It seems natural that Comstock should

have suggested to testator, as he did, that if he desired to make a disposition of his property unlike the statute devolution thereof he ought to make a will. Probably there are few men 50 years old who have not at some time made a similar suggestion to a friend. The record has been searched in vain for evidence that Comstock favored, or desired to favor, any person named in the will, or to increase or diminish the share which any beneficiary should take. In short, if what he did, as he describes what he did, and as it is testified to by others, had been done by some one else, by a lawyer employed for the purpose, it is not likely that any one would have suggested that the will of the testator was not expressed in the instrument now proposed as a last will. It is pointed out that Mr. Comstock is executor and that he prepared a will expressing the desire of the testator that he be given a greater compensation than is allowed by statute. He testified that the testator desired him to settle his estate; that he, knowing something about the nature of the estate, declined to do so; that they talked about it and its general character; and that the testator agreed that he ought to have additional compensation.

But of what significance is this as affecting the questions of the mental competency of the testator or the exercise of an undue and fraudulent influence upon him? That a person has a sinister purpose may, of course, be shown by his acts. But mere innuendo is not enough to make an act or series of acts, apparently innocent, fraudulent and sinister. Counsel for contestants say that:

"The relations existing between Comstock and deceased were of the most confidential character and such as to raise a presumption of undue influence and cast upon Comstock the burden of showing absence of such influence."

Assuming the premise for this legal conclusion to

191 Mich.—10.

be true, in my opinion, Mr. Comstock has sustained the burden of showing absence of undue influence. There is no testimony tending to prove the exercise of undue influence. But the relations of these men were not confidential within the meaning of the rule invoked by counsel. Undoubtedly, there was the confidence of friendship, although particular intimacy is not shown, and of agreeable business relations. The record is barren of testimony tending to prove that Mr. Comstock had any interest, present or remote, direct or indirect, in the disposition of property which the testator should, and did, make. A man enjoying the perfect confidence of his neighbor may prepare his neighbor's will, and may even suggest to him that a will ought to be prepared, without raising the presumption that he unduly influenced him, or that his conduct is reprehensible. It is said that Mr. Comstock inserted in the will the provision for extra compensation and the one giving to the executor power to sell property at private sale. There is testimony, too, tending to prove that Mr. Comstock had offered to testator, and wished to acquire certain property for, a sum less than it was worth—at any rate, less than the value later placed upon it by the appraisers. But Mr. Comstock testified that testator at one time agreed to sell him his interest in the property for the sum he (Comstock) offered to give him and went so far as to have an agreement in writing to that effect made out. It was not executed.

There is other alleged conduct of Mr. Comstock with respect to certain mortgages given by two of the children of Calista Burgess which testator at one time held and owned. It is said that the testimony I have referred to, and other testimony, tends to prove a disposition and state of mind of Mr. Comstock which makes it probable that he imposed upon his friend, the testator, and probable that the instrument in question

does not evidence the testator's real will. The testimony wholly fails to incline my mind to such a conclusion.

Numerous excursions were taken by witnesses and counsel which cannot be noticed. The record contains more than 500 pages, and in the view I take it is unnecessary and would be wholly unprofitable to analyze the testimony. In my opinion, there is no testimony tending to prove mental incompetency, the exertion of undue influence, or that the instrument offered for probate does not express the will of the testator.

The judgment is affirmed.

STONE, C. J., and KUHN, BIRD, MOORE, STEERE, BROOKE, and PERSON, JJ., concurred.