*In re* HASLICK'S ESTATE.

MARTUS *v.* HASLICK.

1. WILLS—EVIDENCE—UNDUE INFLUENCE.

Evidence that a testator had repeatedly told his neighbors how he was going to dispose of his property and a disposition of his property not in accordance with such statements is not sufficient proof of undue influence.

2. SAME—INSANE DELUSIONS—EVIDENCE.

Capricious and arbitrary dislikes, unjust suspicions against relatives, or mistaken beliefs as to their feelings and designs towards a testator and his property, however visionary, or belief of acts or facts which have any evidential basis, do not constitute insane delusions.[1]

3. SAME.

Evidence that a testator stated that his two brothers came to his place one night and tried to kill him for his money, one having an ax and the other a club, and that

———

[1]On what constitutes capacity or incapacity in making of wills, see extensive note in 27 L. R. A. (N. S.) 2, particularly as to insane delusions, see p. 62 of same note.

On what is testamentary capacity, see note in L. R. A. 1915A, 444.

they once came there to kill him for his money with some poison pills which they wanted him to take, and that he heard them there whispering and talking low to that effect, *held*, insufficient to show insane delusions in the absence of proof by contestants of the nonexistence of the facts claimed by the testator.

4. SAME—COMPETENCY—INSANE PERSONS—EVIDENCE.

Proof of a testator's habits, business ability, irrational or rational conduct, or physical or mental condition at other times, is competent and material as bearing on the question whether the testator was of unsound mind at the time of making his will.

5. SAME—VALIDITY—TESTAMENTARY CAPACITY.

The final test of the validity of a will, as based upon the competency or incompetency of a testator, is his testamentary capacity at the time of the execution of the will.

Error to Lapeer; George W. Smith, J. Submitted October 20, 1916. (Docket No. 18.) Decided March 30, 1917.

James F. Martus and others presented for probate the last will of August Haslick, deceased. From an order admitting the will to probate, contestants, Gottlieb Haslick and others, appealed to the circuit court. Judgment for proponents. Contestants bring error. Affirmed.

*W. E. Brown* and *B. F. Reed,* for appellants.

*Theo. D. Halpin,* for appellees.

STEERE, J. On July 5, 1913, August Haslick, a resident of Burnside township in Lapeer county for many years, died in the city of Port Huron where he had gone to a hospital for medical treatment. He was then 65 years old, and left a last will and testament, executed on September 3, 1912, disposing of an estate consisting largely of realty, including 400 acres of land in Burnside township, appraised at between $17,-

000 and $18,000. He had never married and, as heirs who would have inherited his estate had he died intestate, was survived by two brothers, Charles and Gottlieb, two married sisters, Mary Homer and Minnie Bennett, and the children of a deceased sister named Smith. His will was admitted to probate in Lapeer county on October 7, 1913, from which an appeal was taken to the circuit court by the disappointed prospective heirs, excepting Mrs. Homer, where the contest was retried before a jury, resulting in a verdict and judgment affirming the action of the probate court, and the proceedings of that trial were then removed to this court for review by writ of error.

The will in contest is clear and concise in language and legal form, properly executed with two attesting witnesses. Aside from the formal parts it contains four short paragraphs. By it deceased provided for the payment of his just debts and funeral expenses, appointed James T. Martus of Burnside township executor, gave to his surviving brothers and sisters and the children of his deceased sister, Mrs. Smith, $1 each, and disposed of the bulk of his estate as follows:

"4th. I give, devise and bequeath to my sister's children, Kate Homer, Lizzie Homer, John Homer, Fred Homer and Mary Homer, all the rest and residue of my estate of every kind and nature to be divided between them equally, share and share alike."

The grounds urged by contestants against the validity of the will were undue influence and mental incompetency, or lack of testamentary capacity, resulting from chronic alcoholism, attended by insane delusions, which influenced the provisions in testator's will.

Over 60 witnesses were called upon the trial of this issue, and the ample record is largely devoted to the habits, characteristics, and career of deceased, whose life was chiefly spent in Burnside township in agri-

cultural and pastoral pursuits. He was born in Germany and when about 8 years of age came to America with his parents and then living brothers and sisters, the family settling in Lapeer county a year later. He is described as somewhat slow in thought and speech, of meager education, could read or write English little, if at all, and signed his name in German script as long as he lived. He accumulated property gradually by industry and economy, and became a prosperous farmer in the community. Mr. Borland, cashier of a bank at Imlay City for 33 years, during most of which time he testified to an acquaintance with deceased who did business with and borrowed at the bank, said of him:

"In his prime Mr. Haslick was a strong, able-bodied man; he was always a money-maker and had about 400 acres of land. I could not say definitely how long he had owned the 400 acres; he must have owned part of it for 20 years and upwards. There are no mortgages on it at the present time. He cleared off the mortgages some time ago, and in a way he commenced to loan out money in that neighborhood. I don't know of his losing any money myself only in one instance; that was when he went into the threshing machine business. * * * After going into the threshing machine business his indebtedness may possibly have been $500 higher than before, I don't think any more; I never saw him drink intoxicating liquors, and never saw him when he was under the influence of liquor."

It is shown, however, that during his mature years deceased drank more or less of brewed, fermented, and distilled beverages. He at times had all these in his cellar, and was hospitably liberal with them to those who called upon him. He particularly kept on hand an abundance of hard cider, which he drank freely, and to the use of which he became somewhat addicted; that he at times drank to excess and became intoxicated appears to be well established, but even those who testify strongest upon that point give him

the credit of business shrewdness, and sufficient caution to avoid transacting business when disqualified by overindulgence. While as a rule friendly with neighbors and acquaintances, he lived largely to himself on his own place, alone or with employees, and "bached it" much of the time, his interests limited to his farm and business. He was recognized as a man of responsibility, integrity, and business ability in his line of activity. He managed his farms, dealt in live stock, bought and sold commodities, collected and paid money, made leases and looked after his business matters generally until shortly before his death. We think, however, it may be conceded as fairly inferable that habitual use of alcoholic beverages in later life seriously affected his health and probably shortened his years. To what extent it impaired his mentality was a question of fact to which most of the testimony is directed. It was shown that his health failed and there was a marked change in his physical condition during the last two years before he died.

Contestants claimed, and introduced testimony to the effect, that deceased drank regularly and to excess, "scuffed" as he walked, and became bloated, broken down both physically and mentally; that he became forgetful, irritable, his mind unbalanced and possessed of delusions as to events around his premises and the conduct of his neighbors, amongst others claiming his brothers, Gottlieb and Charley, had threatened and tried to kill him. Many of these manifestations the narrators conceded occurred when he was intoxicated, while others are not so modified or explained.

Proponents admit that deceased's health was broken, but deny that his mind was diseased; contend that he was yet in control of his mental faculties and of independent thought; understood his failing physical condition, and for that reason, of his own initiative, dictated his will as he wanted it to a competent person

he selected to prepare it, and then executed it with a clear understanding of its contents and purpose.

Defendants' numerous assignments of error relate to the admission and rejection of testimony, refusal of requests, and charge of the court.

The trial court withdrew the question of undue influence from consideration of the jury, holding there was no evidence in the case to make that claim an issue of fact. This is earnestly urged as reversible error. Counsel do not point out by reference to any pages in the record what particular evidence is relied upon as raising that issue, but suggest that the jury should be permitted to theorize under this proposition:

"August Haslick repeatedly told how he was going to dispose of his property, and it amounted to a fixed purpose. It took some influence to change that purpose, and it was for the jury to say whether it was an undue influence that changed it."

We have searched the record in vain for any testimony of any persuasion, dictation, or suggestion to deceased on the part of any one as to what disposition he should make of his estate. Certain witnesses of contestants testify to his telling them that he would not leave anything to his brothers, to the Smith children, or to Mrs. Homer, or to the "West bunch," and that he was going to give it to his sister in the North, Mrs. Bennett. This sister left home when he was a child, and he had only seen her three times in 50 years or more, the last time many years before he died. His sister's children to whom he left his property were raised near and well known to him. It was also testified that he at one time declared it his intention to make the "Stewart boys," who lived with and worked for him several years, his "sole heirs." We fail to discover in such testimony any evidential facts leading to a legitimate inference that any person exercised any undue influence over him in the

matter. It requires something beyond a bare theory as to why a testator did not make his will as he had talked of doing in casual conversation with neighbors to establish such undue influence as is required to defeat the execution of a will. *In re Williams' Estate,* 185 Mich. 97 (151 N. W. 731).

While the trial court admitted the testimony offered relative to deceased's claimed insane delusions that his brothers plotted against him and had tried to rob or kill him, the jury was instructed there was not sufficient proof of insane delusions relating to the brothers to defeat the will, saying in part:

"There is no evidence in this case that Gottlieb and Charley were not at August Haslick's house under circumstances from which, by a process of reasoning, August Haslick reached the belief that they were there to rob or poison him with pills, and I, therefore, charge you that you must not consider the evidence as to what August Haslick said about Charley and Gottlieb having been at his house to rob or poison him, as proving an insane delusion in regard to them. The only way you can consider that testimony is the same you would other testimony, merely as to whether or not it has any bearing upon the question of his soundness of mind."

Contestants strenuously urge that whether or not deceased was possessed of such delusions as to his brothers was an issue of fact, under the abundant evidence upon that subject, for the jury to decide from all the circumstances shown, and the withdrawal of that question from consideration of the jury was prejudicial error demanding reversal.

In considering this question it is to be borne in mind that no capricious and arbitrary dislikes, unjust suspicions or prejudice against relatives, or mistaken beliefs as to their feelings and designs towards him and his property, however visionary, nor belief of acts or facts which have any evidential basis constitute in law insane delusions.

"If there are any facts, however little evidential force they may possess, upon which the testator may in reason have based his belief, it will not be an insane delusion, though on a consideration of the facts themselves his belief may *seem* illogical and foundationless to the court; for a will, it is obvious, is not to be overturned because the testator has not reasoned correctly." 1 Underhill on Wills, § 94.

The ultimate object of the inquiry is whether an insane delusion, destitute of all evidential support, spontaneously arising in testator's diseased mind, influenced him and operated directly against his brothers when he made his will. It was shown by contestants' witnesses that in the period of his full vigor, more than once, and at least 20 years before his death, deceased had emphatically expressed his intention that his brothers should get nothing from his estate. As the years went by he was at times in trouble with them and at times apparently on friendly terms, but, so far as shown, his intention in that respect was steadfast. While the witnesses are not in harmony as to the exact language used, the substance of the claimed insane delusions as to his brothers' designs upon his life and property seems to involve at least two different events related by him, to the effect that his brothers came to his place one night and tried to kill him for his money, one having an ax and the other a club, and that they once came there to kill him for his money with some poison pills which they wanted him to take, and he heard them whispering or talking low to that effect. The ruling of the court that these beliefs and assertions did not, in law, as the record stood, constitute insane delusions, was apparently upon the ground that the related facts and acts were not physically impossible; that there was some, though perhaps remote and inadequate, basis for the belief, and contestants failed to introduce any proof of the nonexistence of the facts stated by testator as to and

out of which the claimed delusions arose. As bearing upon his delusion that his brothers once came to his place in the night to kill him, it was related by a witness of mature years named Henry Kraick who had known deceased over 35 years, that nearly that long ago, when only a boy, he worked for him, and while there slept in the barn; that he was awakened one night by a noise and deceased "hollering," as he thought, and going to the door saw two men, whom he recognized by their voices as the brothers, in conflict with and pounding deceased, one telling the other to pick up a club and finish him; that deceased crawled in later badly hurt with wounds on his head which left scars along the side, and later had his brothers arrested and tried for the offense. A witness named McIntosh, called by contestants, who testified to deceased telling him of the brothers trying to poison him, said on cross-examination:

"Eighteen or twenty-five years ago he told me about some trouble he had with his brothers. I cut his hair and saw some scars, and asked him how he got them."

Permitted against objection to answer the question, "What did he tell you?" witness replied "He said Gottlieb and Charley."

Contestants' testimony showed that the testator stated place, facts, and circumstances of his brothers' attempts to kill him, which it is asserted were delusions, "without any cause or reasons therefor"; but it was incumbent upon contestants, who introduced evidence of testator's unqualified statements of their guilt and the circumstances, to show further that the brothers were not at testator's home for the purposes claimed, and that there were no facts from which he could, by any process of reasoning, however faulty, arrive at his declared conclusions as to their acts and sinister purpose. The nonexistence of the facts he believed to exist must be established before any pre-

sumption of insane delusions or conclusion of insanity can be drawn.  In their original brief counsel say:

"The law presumes them [the brothers] to be innocent of a crime or any presumption of crime, or any intention to commit crime, until some affirmative evidence is produced to establish this fact, and they had the right to rest upon such presumption."

And it is said in their supplemental brief:

"While we claim all the benefit of the presumption, we do not rely upon it entirely.  *  *  *  If the brothers are entitled to the benefit of the presumption of innocence, it was not necessary that they should take the witness stand and testify that they were not at testator's house to kill or poison him for his money. If they did so testify, it would only be adding the weight of their testimony to the presumption" (citing in support of the presumption *O'Dell* v. *Goff*, 153 Mich. 643 [117 N. W. 59]).

In the case cited the insane delusion of testator was the illegitimacy of his children, and the court said that in the absence of testimony a presumption of the mother's chastity obtained, but the court also said contestant must go further and prove that the testator's belief that his mother lacked chastity was an insane delusion.  Actual or presumed innocence of the party in relation to whom the delusion is claimed does not preclude a sane and honest belief to the contrary for which there is any evidential support, however faulty and insufficient.  The court did not strike out this testimony, but allowed it to remain in the case to be considered by the jury in connection with the rest of the evidence for whatever bearing it might have upon the question of testator's soundness of mind, rightly instructing them that it did not, as a matter of law, compass all the essential elements of an insane delusion, and the jury could not so find.

It was conceded that as the law then stood (since changed by the judicature act [Act No. 314, Pub. Acts

1915; 3 Comp. Laws 1915, § 12004 *et seq.*]) the burden of proof as to mental competency at the time the will was executed rested upon proponents, and the court so instructed the jury in a charge fairly and sufficiently, as we think, explaining the ultimate issue of fact for their determination and the mental condition of a testator essential to testamentary capacity, and necessary for proponents to affirmatively establish in order to sustain the will. The case was essentially one of facts and, as is not unusual where mental competency is the issue, much latitude was allowed in the range of testimony. We are unable to conclude that appellants were unduly restricted as to any competent evidence offered, or that any reversible error appears in the few rulings upon testimony adverse to contestants of which complaint was made, and do not deem any useful purpose would be served by reviewing those objections at length.

While proof of testator's habits, business ability, irrational or rational conduct, and physical or mental condition at other times and places was competent and material for the light such facts might throw on whether he was of unsound mind or sane on September 3, 1912, the final test of this will is his testamentary capacity at the time he executed it. The only direct witnesses as to what he said and did on that occasion and his mental condition on that afternoon are Jesse Rapley, cashier of the Pioneer Bank at North Branch, who drew and witnessed the will, and J. H. Vandecar, a druggist of that place, who was the other subscribing witness. Rapley was a member of the bar, and at one time practiced law, but had been cashier of said bank for 5 years. He was acquainted with testator, who had done more or less business with the bank during all that time, and some weeks prior to the day in question had asked Rapley if he would draw his will for him, and received a favorable answer.

On the afternoon of September 3, 1912, testator went into the bank at about closing time, and asked Rapley to draw up his will for him, to which Rapley replied that it was a little late, and he would prefer to put it off until some other time. Testator said he wanted it done then, as he had had a bad spell the night before, and thought he was going to die in the nighttime and he would like to have the will drawn then, "so if anything happened to him it would go the way he wanted it." Rapley, who was about to leave, then consented to remain and draw the will for him. Asked what he wanted done with his property, he went on and told how he wished the will drawn, stating that he wanted to give a dollar each to his brothers and sisters and the Smith children, as he understood that by so doing they could not get anything more. When told by Rapley that it was not necessary to do this, although it would indicate perhaps more clearly his wishes, he replied that he understood it was better to put in the dollar apiece and wanted it done. He gave the names of the persons mentioned in the will, some of whom were unknown to Rapley, and stated what he wanted to do or not do for them. He said that he wanted James Martus as executor of his will because he had lots of experience in that line, and testator thought he would do the business better than any one else he was acquainted with. After giving Rapley this information, and while waiting for the instrument to be drawn up, he went outside and returned in about half an hour, when Rapley read the prepared will to him, and he stated that was just the way he wanted it. The bank was then closed and only those two present, so Rapley telephoned Mr. Vandecar, a druggist near by, whom testator knew, to come over to the bank and act as one of the witnesses. Rapley testifies that testator was sane and sober, acted as usual, and there was nothing in his appearance to indicate that he had been drinking that day.

Vandecar, who had lived in North Branch about 30 years and knew testator well in a business way for at least 15, testified that after banking hours Mr. Rapley called him up by phone to go over and witness a will. When he arrived Rapley and testator were there, and Rapley stated that the paper which he held in his hand was testator's will, which it was desired that he should witness; that Vandecar then asked testator if that was his will, and he replied that Mr. Rapley had made the will for him and read it to him and he knew every word in it; that he wanted Mr. Vandecar to sign it as a witness, and had told Mr. Rapley to get him; that the will was then signed by testator in the presence of the two witnesses, who signed as such in testator's presence; that he visited with deceased for perhaps 15 minutes after the will was signed; that he talked all right, was sober, acted the same as usual, and witness could see no indication he had been drinking, or there was anything wrong with him. Both these witnesses testified that in their judgment he was in command of his faculties, with sufficient mind and memory to understand and recall his relations and their claims upon him, what property he had, how he wanted to dispose of it, and to retain those facts while dictating his will without prompting.

All other witnesses called by both parties either testified to acts and events transpiring before, or after, the will was executed, or to opinions as to his competency at that time, one or both. Along that line there was abundant testimony on both sides. Of opinion witnesses over 20 neighbors and longtime acquaintances of testator, farmers and business men, some of whom had done business with him after he made his will, testified from personal knowledge of him that in their opinion he was mentally competent when he made his will, could remember his relatives and their claims, if any, on his bounty, knew what

property he possessed and what disposition he desired to make of it, and was capable of dictating without prompting the terms of the will which he signed.

Contestants called as witnesses seven medical men who as experts expressed under oath opinions to the contrary, either in answer to hypothetical questions or from observations made by them, chiefly subsequent to the will, pronouncing him a victim of chronic alcoholism and of unsound mind, not competent to understandingly make testamentary disposition of his property on the date he attempted to do so. We discover in the record but one other witness who directly testified to an opinion that he was not then competent to make and understand the will he signed. The controlling issue of fact raised by the conflicting testimony was not obscure to the ordinary understanding. We are of the opinion that it was fairly and impartially submitted to the jury with a correct and sufficient explanation of applicable rules of law for their guidance in canvassing the facts and deciding the issue as clearly stated to them. From an examination of this record in its entirety we are unable to conclude that any misdirection of the jury or improper admission or rejection of evidence has resulted in a miscarriage of justice, or that any of the assigned errors have so militated against a fair and impartial trial as to warrant disturbing the result reached in the trial court.

The judgment is affirmed.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, and BROOKE, JJ., concurred. PERSON, J., did not sit.