*In re* BOLGER'S ESTATE.

WILLS—COMPETENCY—INSANE DELUSIONS—EVIDENCE—SUFFICIENCY.
In a will contest case, evidence that testatrix, who practically disinherited her children, contestants, made said will as a result of insane delusions in regard to them, *held,* sufficient to present the question of her competency to the jury, under proper instructions.

Error to Wayne; Goff (John H.), J.    Submitted January 9, 1924.    (Docket No. 17.)    Decided April 10, 1924.

The Union Trust Company presented for probate the last will of Lena T. Bolger, deceased.    On petition of William T. Bolger the will was certified to the circuit court where it was contested on the ground of insane delusions.    Judgment for contestants.    Proponent brings error.    Affirmed.

*Miller, Canfield, Paddock & Stone (Albert G. Goetz,* of counsel), for appellant.

*Cornelius, Doland & Boggio,* for appellees.

MOORE, J.    Lena T. Bolger died in the city of Detroit December 8, 1920, leaving a will executed by her November 10, 1913.    This will left to her only son who lived in the village of Homer, Michigan, the sum of $25.    It left to her daughter Elsie M. Bolger, who lived in the city of Buffalo, New York, $25.    It left to her daughter Elizabeth G. Talbot, of the city of Rochester, New York, the sum of $25 and two life insurance policies on the life of the said Elizabeth G. Talbot.    It left all the rest of the estate to the Home

On insane delusions as proof of incapacity of testator to make will, see notes in 27 L. R. A. (N. S.) 62; L. R. A. 1915A, 458.

for the Homeless in the city of Utica, New York. The insurance policies mentioned were for $100 and $114. The inventory of the estate left by Mrs. Bolger showed it to be worth upwards of $10,000. The children of Mrs. Bolger contested the will upon the ground of incompetency, undue influence and insane delusions as to her relatives and children, and the Catholic church.

Upon the petition of William T. Bolger the will contest was certified to the circuit court for trial. After the testimony was all in the court was requested to direct a verdict in favor of the proponent. This he declined to do, and submitted the case to the jury in a charge from which we quote as follows:

"It is better for us in the first instance, to clear away as much as possible those things which might interfere with the perception of the issue in this case, and I charge you that the contest of this will is not made upon the ground of general incapacity of the testatrix, Lena T. Bolger, to make a will; and further, that there is no evidence in this case that any undue influence was exercised upon said Lena T. Bolger by officers or agents or representatives of the Home for the Homeless, the principal beneficiary under the paper writing which is claimed to be the will of Lena T. Bolger. * * *

"The testatrix at the time she executed this will in 1913 is presumed by the law to be competent.

"You are instructed that an owner of property, desiring to dispose of the same by will, has the right to distribute it according to his or her own judgment, and may give nothing to the children, or may divide it equally among them or other relatives, or leave the same to others not related to the testator, at his or her pleasure; and of this right a property owner cannot be deprived; nor is a will made in execution of such purpose to be lightly set aside; and no will is to be deemed invalid because the jury are of the opinion that a different disposition ought to have been made; nor is the disposition made by a testatrix, if otherwise valid, to be overruled or overridden by a jury. * * *

"In order to overthrow the presumption of law that Lena T. Bolger was mentally competent on November 10, 1913, to make the will that is produced in evidence, it must be shown by competent evidence that she made said will as the direct result of a delusion—insane delusion or insane delusions emanating from an unsound mind, and that in the absence of such insane delusions she would not have made said will."

The judge then stated the claims of contestants and proceeded:

"An insane delusion exists when a person persistently believes supposed facts which have no real existence, and so believes such supposed facts against all evidence and probabilities and without any foundation or reason for the belief, and conducts himself or herself as if such facts actually existed.    *    *    *

"If a person has a belief for which there is a valid reason or for which there is a foundation, that belief can hardly be called an insane delusion.

"The burden of proof as we have already I think, stated, or will state now, is upon the contestants in this case to show by a preponderance of the evidence that Lena T. Bolger, at the time she made this will in 1913, had a delusion which was an insane delusion, —an insane delusion which operated upon her mind to the detriment of her children.    *    *    *

"Some evidence has been introduced in this case by experts relative to the subject of monomania. Monomania is insanity upon a single subject; it is an insane delusion which renders the person afflicted incapable of reasoning on that particular subject.    He assumes that to be true which has no foundation or reason in fact on which to found his belief.

"In regard to insane delusions, unless an insane delusion influenced the testatrix in the disposition of her property to the prejudice of the contestants, they cannot prevail in this case.

"If you should find as a matter of fact, by a preponderance of the evidence, that at the time this will was executed the testatrix was laboring under any one or more of the insane delusions which have been called to your attention, and acted upon one or more of such delusions, and such insane delusion influenced

the testatrix in making the will she made, then such an insane delusion, if it operated on the mind of the testatrix and dictated the making of the will, it would avoid the will.

"Capricious and arbitrary dislikes, however, unjust suspicions against relatives, or mistaken beliefs as to their feelings and designs towards the testatrix and her property, however visionary that belief, of acts or facts, which have any evidential basis, do not constitute insane delusions.    If there are any facts, however little the evidential force they may possess, upon which the testator may in reason base his or her belief, it will not be an insane delusion, though on consideration of the facts themselves this belief may seem illogical and foundationless; for a will, it is obvious, is not to be overturned because testator has not reasoned correctly.    Actual or presumed innocence of the party in relation to whom the insane delusion is claimed does not preclude a sane and honest belief to the contrary, of which there is any evidential support, however faulty or insufficient.    *    *.    *    A belief of the testatrix that her children lacked filial affection or had treated her wrongly or injuriously, would not be an insane delusion, if you find that there was any foundation or reason for that belief.

"If you find that the testatrix at the time of making her will in 1913 acted and conducted herself as if she had a persistent belief that her children had not treated her fairly or justly or affectionately, but had treated her wrongly and injuriously and further find, that there was no evidence or probability for such belief, and find further, that such belief was without any foundation or reason,—then in such case such belief may be considered as an insane delusion.    If however the testatrix had any reason to believe that her children had not treated her fairly, justly or affectionately, but had treated her wrongly and injuriously, such belief would not be an insane delusion.    *    *    *

"If you should find in this case that any witness has testified falsely upon a material point in the case, you are entitled to disregard such evidence, unless that testimony should be supported by other evidence which you do believe.

"If you should find for the proponent, that the will is valid, then your verdict should be that the will is the last will and testament of Lena T. Bolger.   If you should find for the contestants, it would be sufficient for you to say that you find for the contestants of the will."

The jury returned a verdict in favor of the contestants.   Counsel then moved the court for a judgment *non obstante veredicto* for 12 different reasons, some of which are:

(1) That the verdict is not sustained by any evidence whatever.

(2) Because the verdict was for the contestants upon grounds which in no way impaired the validity of the will.

(3) Because there is no evidence in the case of any insane delusions.

(4) Because there is no evidence in the case tending to show that the will was not the last will and testament of Lena T. Bolger, deceased.

(5) Because the verdict is contrary to the great weight of evidence adduced in the case.

(6) Because there is no evidence to show that deceased was suffering from any insane delusions on November 10, 1913, or that any insane delusions affected the will made by her on that date.

The judge overruled the motion and entered judgment upon the verdict.   A motion was then made for a new trial based upon substantially the same reasons. This motion was overruled and the case is brought into this court by appeal.

Counsel raise in this court the same questions that were raised in the court below by the motions we have mentioned.

We now quote from the brief:

"The main question involved in this case is whether on November 10, 1913, the day testatrix made her last will and testament, she was or was not afflicted with insane delusions as to her children.   Appellant claims that the record is absolutely devoid of any

evidence of insane delusions and that the court was in error in overruling proponent's motion for a judgment *non obstante veredicto.* .

"It becomes necessary to determine what is an insane delusion. According to all the decisions of this court, to constitute an insane delusion, one must believe a supposed fact which has no real existence except in his perverted imagination, and he must believe in it against all evidence and probability and conduct himself, however illogical, upon the assumption of its existence. *Bean* v. *Bean,* 144 Mich. 599; *In re Rosa's Estate,* 210 Mich. 628; *In re Haslick's Estate,* 195 Mich. 439 (Ann. Cas. 1918D, 466)."

An examination of these cases shows them not inconsistent with the charge of the court upon the subject of insane delusions.

We again quote from the brief:

"Proponent asserts that injustice would be done to set aside the will of this testatrix and permit contestants here to get possession of the estate which testatrix did not want them to have. It is apparent testatrix exercised her discriminatory powers in making bequests to her children; to Lizzie she gave more than the others in the nature of two life insurance policies. The entire testimony fails to show any evidence that she was afflicted with any insane delusions on November 10, 1913, and that any such influenced her conduct in her dispositions under that will on that day. *In re Ver Vaecke's Estate,* 223 Mich. 419. Consequently, we say with Chief Justice MOORE in the contested will case. *In re Doty's Estate,* 212 Mich. at page 371:

" 'It may be well to hark back to the early. cases. Chief Justice CAMPBELL in *Pierce* v. *Pierce,* 38 Mich. 412, 420, 421, said in part: "We referred in *Latham* v. *Udell, ante,* 238, and we think it not improper to refer again to the wrongs done under color of law, by the attempts which are becoming so common as to be dangerous to the security of private property, to overthrow wills because they do not suit the notions of those who determine their validity. The right to make a will as a testator chooses is as sacred as any other right, and a finding that the will is not valid which is based on any other foundation than a conscientious conviction of actual incapacity shown by

the testimony is a disgraceful outrage on justice, and a plain violation of the oath under which the conclusion is asserted. It is incumbent on courts to keep out of these cases everything which is merely calculated to create prejudice without throwing light on capacity, and prevent the establishment of fallacious tests which no one would think of acting on in business transactions, to throw doubt on testamentary capacity." '

"The foregoing certainly was not adhered to in the case at bar and if it had, the court would have directed a verdict sustaining the will. *In re Mann's Estate,* 219 Mich. 695; *In re Emmons' Estate,* 219 Mich. 476; *In re Cochrane's Estate,* 211 Mich. 370; *Phelps* v. *Beard,* 209 Mich. 266; *In re Weber's Estate,* 201 Mich. 477; *In re Gardnier's Estate,* 198 Mich. 203; *In re Fay's Estate,* 197 Mich. 675; *In re Wynn's Estate,* 193 Mich. 223; *In re Ferris' Estate,* 191 Mich. 140; *In re Curtis' Estate,* 190 Mich. 377; *In re Williams' Estate,* 185 Mich. 97; *In re Shepard's Estate,* 161 Mich. 441.

"We respectfully submit that the judgment should be reversed and one entered sustaining the will in question."

An examination of these cases will show that in some of them the question of insane delusions was not involved. No one of them can be said to be controlling of the instant case as a matter of law.

Was there testimony to carry the case to the jury upon the question of insane delusions? The record is a very long one and it is not practicable to go into it in detail. The record discloses that the married life of Mrs. Bolger was a very unhappy one. Mr. Bolger was a Catholic and was given to an undue use of liquor and died shortly after drinking to excess. Mrs. Bolger frequently spoke of him in very bitter terms. At the time Mr. Bolger died, in January, 1878, William T. was about 8 years old, Elizabeth was about 6 years old and Elsie was not quite a year old. Elizabeth remained with her mother until she married, with her mother's approval, when she was 16 years old. The testimony indicates she was not strong

physically or mentally, that she was the mother of 18 children, 4 of whom were living and at the time the will was drawn she was very poor.

Elsie lived with her mother until she was 2 years old, when she went to live with her father's parents, where she remained until she was 10 years old, when she went back to her mother and remained with her until she was 18 years old.    William remained with his mother until he was 22 years old.    Elsie worked at dressmaking and William was a newsboy, and did other work, and both he and Elsie contributed their earnings to the mother.   · They had differences with their mother from time to time; with Elsie these differences grew out of her attending dancing school and not returning home as early as her mother thought she ought.    Her mother whipped her and after one of these whippings she went to Buffalo, and that her mother might not know where she was, at the suggestion of a chum, she took the name of Elsie Allen. Evidently her mother soon found where she was for she sent her clothes to her in Buffalo, and, during the Pan-American Exposition, visited her at Buffalo for two days, and visited her there at other times.    The testimony is that the mother wrote Elsie in 1901 to come to Rochester as her lawyer Mr. Shuart wanted to talk with her; that later when Elsie went, her mother told her "Mr. Shuart was dead, that he had drawn a will for Mrs. Bolger making Elsie executrix," and saying:

"I have left a certain amount of money for Will, and a certain amount for Lizzie and the balance and all my diamonds are for you.    If any of you children make a fuss over this will you will forfeit all your share."

It may be well to go back some years.    About 1886, Mrs. Bolger became well acquainted with one John Adams, who died in 1900, from whom Mrs. Bolger obtained considerable property.    After his death Mrs.

Bolger took a year's trip through the west and then made Detroit her home. Elsie visited her mother quite often in Detroit, staying two or three weeks, at a time, and bringing her presents at Christmas and at other times. When William was about 18 years old he became a member of a Blaine-Logan campaign club. His mother did not approve of this, but later they corresponded with each other and Mrs. Bolger visited him upon two or more occasions and he visited her six or eight time's, and when he did so he furnished all the food and refreshments for Mrs. Bolger's table. Mrs. Bolger always kept whisky or gin in her house, though she never used it to excess. Upon one occasion he gave her a small wicker jug of whisky. We will refer to this later.

In 1912 Mrs. Bolger made a will. This was destroyed when the will in controversy was made. To her attorney who drew the will she said among other things, we quote:

"In regard to William, as near as I can remember her language, she said he only came to see her or got in touch with her when he wanted some money. I would not say she arranged her words just that way, but those were the words used. She said her son who lived somewhere down in Michigan, when he wanted money, then is the time he would come around after her, but never any other time. That is as near as I can get to it. I believe those are almost her exact words in that case."

We quote some of the testimony of William:

"I received other letters from my mother. Sometimes she would write every week or so and then there would be times when I would not hear from her for perhaps a year. In about the same way when I would hear from her I would write to her and there were times when I wrote to her even though I had not heard from her for a long time; I tried to keep in touch with my mother as much as I could. It was a custom of mine ever since childhood to give my mother little gifts, sometimes at Christmas times

and sometimes on her birthdays.    Little articles to
wear such as handkerchiefs and slippers and something
for the house, such as vases and pictures.    This
practice continued until the year 1913.    At that time
I was living in Allegan and my relations with mother
were very pleasant.    I believed that they were, we
were in correspondence continually and it was some
time during the first week in November, 1913, she
was on Clairmont avenue then in Detroit and I wrote
her.   *   *   *   I asked mother if for one thing she
was going back home at Thanksgiving time, that
if she was to let me know immediately as I intended
to dress a chicken and send it to her for a Thanks-
giving dinner.    Within a few days I received a reply
from her.   *   *   *   She wrote to me and told me that
she did not want any chicken from me, that I should
save my chickens as I might need them myself some
day, that she had plenty of the long green and could
buy her own chickens, that I might need my chickens
to feed my own hungry mouths, and she also said that
I should never send her anything again that she had
got through with her children, that she had done all
she ever intended to do for them and she spoke of
that drunken brute of a father that had brought us
into this world, and she also spoke that we would all
have been better off had we only died when he did, and
she said that she had been at my house for the last
time, that she would never darken my door again and
she said that I need not write to her or worry about
her any more, and she also said that she was going
to write a like letter to my sisters.    I had had abso-
lutely no quarrel or trouble or friction with my mother
up to this day, so far as I know' the letter was un-
called for.   *   *   *

"Q. Did you ever write to her for money that she
did not send you?

"A. No.

"Q. Did she ever send any without your asking her?

"A. No, only the fifty dollars.

"Q. Only fifty dollars?

"A. That was all she ever sent me, that was while
I was in Indianapolis, and I later told her I wanted
to give it back and she would not take it.   *   *   *
She did not say anything to me in any of her letters
about me coming to Detroit, but I told her I was going

to come to visit her. She answered that she had a house full of roomers and would not be prepared to take care of me at this particular time. The last letter I wrote her was about a year before she died. I had written her that I had a car and might visit her. She never answered that letter. Some months after that I received a package by parcel post. In the left-hand corner of the package was said 'In case not delivered inside of 5 days return to Mrs. L. T. Bolger, seven hundred and something John St., Utica, New York.' The package contained photographs of mine. They were pictures that mother had always had at home. On one of the pieces of cardboard around the pictures had been written in mother's handwriting—leaving Detroit. That is the last that I ever heard from my mother. I am not a man in the habit of using intoxicating liquor. I have never used any intoxicating liquor in the presence of my mother. I have never been intoxicated. I never used cigarettes. I never gambled in my life in any way. I have never been convicted of any criminal offense."

We have quoted only a small portion of William's testimony.

Mrs. Holmes, a neighbor of Mrs. Bolger, testified in part:

"She has told me that her children were no good, that they were like their father.

"*Q.* What did she say to you about the father? Did she describe him?

"*A.* She said he was a dirty low Irish Catholic drunkard, no good. She said he was dead. She said he had died with one of the vilest diseases known."

In 1918, Mrs. Bolger wrote the United Charities Association at Rochester, New York, we quote from the letter:

"Could you kindly give me any information concerning my daughter Elizabeth Talbot. Some two or three years ago, there was a member of the associated charities in this city called on me and informed me that she had heard, through your organ-

ization in Rochester who wanted her to call on me, and explain in regard to my daughter's health, and could I not do something for her. Am very sorry but had to tell the lady that I certainly could not. I am now close to my seventieth year and obliged to earn my own living by taking boarders, which I have done since I came to this city, and I can assure you that it is pretty hard trying to make a living in these times of war and high cost of living, and when our government needs all our young men. I have been self-supporting for fifty years or more and have raised a family of three children. When they were babies they were mine, but as they grew up to manhood and womanhood, they seemed to have gone in the footsteps of their father, who filled a drunkard's grave when only a young man. Am very sorry to say, haven't seen or heard from any of them for years. Only in some indirect way."

Elsie's testimony is that she not only corresponded with her mother, but visited with her until 1917. She says that at the time her mother told her about the will in which Elsie was named as executrix

"she told me that William had sent her a jug of whisky. It was a wicker covered jug and she showed it to me. It was, I imagine a half gallon and she said 'I will never touch that whisky.' She said 'I believe he might have put poison in it, because you know, Elsie,' she said, 'He would do that to get my money.'"

We quote from a letter produced by Elsie written by her mother:

"72 Clairmount Ave., Detroit, Mich.
July 22nd,

"Well Elsie: Just a few lines on this my sixtieth birthday. I am writing one to each of you that I am well and still able to earn my own living. When I look back when you were a kid, how many many days and nights I worked at the washtub and toiled at the sewing machine to earn bread for you kids and what an unhappy life was mine with that drunken brute you call father. If there is any hell I hope he is suffering all the everlasting torments for what I suffered at his hands, but that all was in my younger

days. Thank goodness, I can be perfectly independent * * * of any daughter-in-law or son-in-law and will never have to be under obligations to my children. I have been for the last time in any of your homes."

Elsie testified she visited her mother in Detroit in 1913.

"During the visit I asked her if she heard from Will and she said she had but I never want to hear from him again or see him again and I will never go to his house again. She said 'When I made him my last visit in Spencerville, they had nice things in the garden but he never offered me a thing when I came home and I will never go to see him again.' As to this letter she says 'He was to send me a chicken. I don't want his chicken. I have plenty of money to buy my own chickens, if I want one. Some day he will need his chickens for his own family. I don't want his chicken and I will never take it.' 'Do you remember one time I showed you a bottle of whisky he sent me? I never used that whisky and I would not use his chicken. I thought then that that whisky had poison in it and I believe he put poison on the chicken. He would even do that to get my money.'

"*Q.* Did she say anything else in this conversation about the rest of the children—any other of the children?

"*A.* Yes, sir, she said I believe any one of you children would do the same thing, I would not put it past any of you, to get my money. I said you ought not to talk like that, we only give you things to be good to you, and she said, 'well you don't need to give me anything because that is all you want, you want to get my money.'

"*Q.* Did you make any reference in this conversation to who her heirs were?

"*A.* Yes, sir, she said, you don't need to be good to me because I have no children and I have no heirs, you are all like your father—you are all bred the same way."

Elsie sent her mother a shirt waist as a Christmas present; it was returned by the mother who asked that it be changed for a petticoat. Elsie sent her a sateen

petticoat; this was sent back by the mother who also sent a letter from which we quote:

"Detroit, Michigan, 2-11-18.

"Dear Elsie: I'm going to write you some letter, yes, I have the package it's coming back to you.    If you had been here, I would have told you something, believe me, have not come to that yet where I have to wear paper cambric in 0 weather.    I have plenty of wash skirts that have more warmth than that if it were something for yourself nothing would keep you from getting it if you had to take in Main street from one end to the other end.    Some children would have said the very best isn't too good for my mother, then others say anything will do for her, that's the kind of stock I worked for day and night for to feed 3 hungry mouths if I had to depend on them now I could freeze it's not summer up here either, Monday a. m. 18 below.    I walked to German bakery, stopped in three places to get warm before I got there, no birdie would bring me bread have to earn it still at my age.    Thank goodness, I looked ahead and slaved for just this critical time.    It's just 40 years ago the 11th of last month that the divil took that drunken brute.    You were less than 1 year old and I stood over the wash tub day and night washing other people's dirty rags to feed you and 2 others.    I have gone through a living hell for your sakes and none of you have ever shown me the least bit of gratitude, but there's none of you dead yet.    Everything that happened in those years has made an indelible impression on my mind.    I haven't forgot anything. Were I placed in the same position today and you and the others to depend on it would mean over the Hill for me.    What have you or the others done for me, nothing but disgrace for which I have lied time and again to cover."

We quote further from the testimony of Elsie:

"Between 1897 when I first saw my mother after I left home, and the Pan-American when I next saw her, a period of about four years, we corresponded back and forth about once a week.    Between the Pan-American and this Buffalo visit, a period of about eight years, we also corresponded about the same and

between 1909 and 1913, a period of about four years when I had not seen my mother, we wrote to each other, about the same. Between 1913 and 1915 when I said I saw her again, a period of about two years, she wrote to me and I wrote to her about the same. Between 1915 and 1917, when I next saw her an interval of about two more years, I heard from her. I never heard from her since that last letter I got, the one that was read."

We think it would be useless to quote more of the testimony, but add that medical experts testified in answer to hypothetical questions, they were of the opinion that Mrs. Bolger was the victim of insane delusions as to her children.

The case of *Rivard* v. *Rivard*, 109 Mich. 116 (63 Am. St. Rep. 566), is a leading case on the subject of insane delusions, we quote from it:

"Counsel urged and requested the court to charge, that Mr. Rivard was competent to attend to his business affairs, to make deeds, leases and contracts, and therefore competent to make a will, for the reason that it requires less capacity to make a will than to execute deeds and contracts. If the alleged incompetency depended upon *senile dementia* or general insanity, counsel's contention, under the instruction of the court, as to competency in this regard, would be correct, and the court should have directed a verdict for the proponents. This rule is settled not only by the authorities in Michigan, but is recognized by courts generally. The difficulty with this contention is that it does not apply to this case, and the court eliminated it from the consideration of the jury by instructing them that Mr. Rivard was competent to do all these things, and that competency continued to the end of his life. Counsel ignored the other well settled rule—that, while a man may be possessed of such capacity, he still may be unable to execute the will in question, on account of some delusion which has beclouded or taken away his judgment in regard to those who are the natural objects of his bounty. If a testator disinherits a daughter upon the belief that she is a bad woman or that she is not his offspring,

or a son upon the belief that he is a drunkard, or his grandchildren upon the belief that his son-in-law has threatened to kill him, and it appears that there is no foundation in fact for any such beliefs, and they are shown to be mere delusions, a will disinheriting such children and grandchildren is void, notwithstanding he was entirely sane upon every other subject, and fully competent to manage his business affairs."

See *O'Dell* v. *Goff*, 149 Mich. 156 (10 L. R. A. [N. S.] 989) ; *O'Dell* v. *Goff*, 153 Mich. 645.

In *Re Thayer's Estate*, 188 Mich. 261, 265, it is said, we quote from this case as follows:

"It appears that while in Dakota he cherished a violent dislike and resentment toward his wife and his children, and in 1900 filed the bill charging his wife with adultery on information and belief.    In 1907 in the answer which he filed to the bill filed by his wife in this State, he alleged that 'in the spring of 1892, he personally detected her in an act of illicit carnal intercourse and adultery, at their residence with one Henry Wrang.'    It is the claim of the contestant that there was absolutely no ground for this charge, and that it was the product of an insane delusion. This it is claimed is evidenced by the fact that, when the charge is first made in 1900, he claimed knowledge of it on information and belief, and seven years later claims to have personally detected it, and also by the fact that the proofs show that Henry Wrang was not in Aurelius township where the farm is located, in 1892, and had not been seen by any member of the family for years, and that he also became obsessed with the insane delusion that his youngest boy was illegitimate, and on referring to his children called them vile names.    It will be impossible to review the testimony of witnesses who described his conduct during his stay in Dakota, and told about his cursing and swearing and the excitable condition of mind he got into when the names of his wife and family were mentioned.    It will be sufficient to say that in our opinion there was abundant testimony to warrant the court in submitting to the jury the claim of contestant that his father was suffering from an insane delusion and that the will as made was a result thereof."

See *In re Rockett's Estate,* 191 Mich. 499, 505; *In re Hewitt's Estate,* 199 Mich. 240; *In re Rosa's Estate,* 210 Mich 628, 636.

There is no testimony in the record indicating any unkind act by any of Mrs. Bolger's children after they became adults, toward their mother.    There is nothing to indicate that any of them would poison her. There is nothing to indicate that they were seeking to get her property or money, unless it was when she sent William $50 which he offered to return.    The testimony of William is that he was never intoxicated in his life and no one contradicts it.    There is no testimony that any of the children were drunkards or were given to undue use of liquor.    We think the court properly and fairly submitted the case to the jury.

The judgment is affirmed, with costs to the appellees.

McDONALD, BIRD, and SHARPE, JJ., concurred with MOORE, J.    CLARK, C. J., and STEERE, FELLOWS, and WIEST, JJ., concurred in the result.