*In re* ROSA'S ESTATE.

NEWNHAM *v.* NEWELL.

1. WILLS—MENTAL COMPETENCY—EVIDENCE—QUESTION FOR JURY.
    In a will contest case, evidence of the mental incompetency of testatrix *held*, sufficient to justify its submission to the jury.

2. SAME—INSANE DELUSIONS—EVIDENCE.
    The belief of testatrix that contestant, her niece, was an immoral woman and unworthy of her continued regard, if founded on repeated false statements and insinuations made to her by proponent, so that her mind became obsessed with their truth, although her lifelong acquaintance and personal relations with contestant should have led her to reject them, was nevertheless a delusion.

3. SAME—LANGUAGE OF WILL ADMISSIBLE WHERE CONTRARY TO FACTS.
    As bearing on the question whether testatrix was acting under a delusion, the jury had the right to consider the language in the residuary clause of the will that proponent "has done more to help me and make my life happy than any other person"; there being nothing in the record to support such belief.

On what constitutes capacity or incapacity to make a will generally, see notes in 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444.

4. SAME—WHEN DELUSION EXISTS.

An insane delusion exists when a man or woman persistently believes supposed facts which have no real existence, and so believes such supposed facts against all evidence and probabilities, and without any foundation or reason for the belief, and conducts himself or herself as though such facts actually existed.

5. SAME—INSANE DELUSIONS—EFFECT ON WILL.

Unless such insane delusion influenced testatrix in the disposition of her property to the prejudice of contestants, they could not prevail.

6. SAME—UNDUE INFLUENCE—QUESTION FOR JURY.

The testimony as to undue influence, *held*, to present a question for the jury.

7. SAME — TESTIMONY AS TO TESTATRIX'S LIFE — DISCRETION OF COURT—ABUSE.

Where, subsequent to an illness, there was a marked change in the life of testatrix, which contestants claimed was due to weakness of mind and body, the trial judge did not abuse his discretion in admitting testimony as to her life before and after said illness.

8. EVIDENCE—HYPOTHETICAL QUESTION NEED NOT INCLUDE ALL THE TESTIMONY.

A hypothetical question need not include all of the facts concerning which testimony has been given, but the opinion of the witness may be taken on any combination of facts which counsel may believe the jury will find to be established by the proofs, using only such testimony as he feels satisfied will be accepted by the jury as true.

Error to Kalamazoo; Chester (Guy M.), J., presiding. Submitted April 13, 1920. (Docket No. 48.) Decided June 7, 1920. Rehearing denied July 20, 1920.

Richard L. Newnham, executor, and another presented for probate the last will of Susan Rosa, deceased. The hearing was certified under the statute to the circuit court. Elizabeth Newell and another, sole heirs at law, contested the allowance of the will. Judgment for contestants. Proponents bring error. Affirmed.

*Lincoln H. Titus (Harry C. Howard.* of counsel), for appellants.

*Weston & Fox* and *Jackson & Fitzgerald,* for appellees.

SHARPE, J.   Susan Rosa, a widow 84 years of age, and long a resident of Kalamazoo, executed a will on April 10, 1917.   She died July 23, 1918.   The proponent Newnham presented the will for probate, objections having been filed thereto by the contestants. The hearing was certified to the circuit court under the provisions of section 1, chapter 65, of the judicature act (Act No. 314, Public Acts 1915, 3 Comp. Laws 1915, § 14145).   The will was executed in conformity with the statutory requirements.   It had been prepared at her home by Mr. Newnham.

It was contended by contestants:

(1) That at the time of its execution the testatrix lacked the mental capacity to make a will.

(2) That she at that time labored under an insane delusion as to one of the contestants.

(3) That she was unduly influenced to execute the same.

These several questions were submitted to the jury, who found against the will.   From a judgment thereon, which included an order certifying the same to the probate court, the proponents appeal.

There are a few pertinent facts about which there is no disagreement which may well be stated at the outset.   The testatrix and her husband, Ira Rosa, were married in 1855, and lived happily together until his death in 1905.   They had no children.   He left a will by which his widow became the owner of about $16,-000 worth of property, a part of which consisted of 5 houses and lots in Kalamazoo.   The contestants are the niece and nephew and sole heirs at law of the deceased.   After the death of Mr. Rosa  Elizabeth New-

ell, then the wife of George B. Newell, who also resided in Kalamazoo, at the request of the deceased, assisted her in looking after her property, collected the rents, deposited the moneys, and in a general way had charge of her affairs. This continued until about the month of June, 1914. The testatrix had quite a severe attack of illness in 1905 and 1906, and again in 1913. She was uneducated, being unable to read or write except to write her own name. In 1913, the relations of the Newells became strained, resulting in a separation. A few months thereafter, Mr. Newell entered the home of the deceased and continued to live there until her death. Soon thereafter, she withdrew from Mrs. Newell the charge of her property interests and transferred it to him. He was at that time, had been before, and continued to be, considerably addicted to the excessive use of intoxicants.

Mrs. Newell began divorce proceedings against her husband in 1914. These were apparently abandoned, and he filed a bill therefor against her in 1916. In it the proponent Newnham acted as his attorney. This she defended and asked relief in a cross-bill, which was granted, unopposed. Their property matters were settled by private agreement.

On February 15, 1916, the deceased made a will in which the bulk of her estate was bequeathed to George B. Newell. This was drawn by Mr. Newnham, and in it he was named as executor. The contestants were each left $500. On March 15, 1917, the contestants filed a petition in the probate court, asking for the appointment of a guardian of the person and estate of Mrs. Rosa. In it she was alleged to be mentally incompetent to have the care and management of her property, which was therein specifically described. The hearing on this petition was continued until April 10th, when it was abandoned by petitioners. Mr. Newnham was retained by George B. Newell to act

for the deceased in this proceeding. Afterwards, and on the same day, the will in question was prepared by Newnham at the home of Mrs. Rosa. In it but $10 was bequeathed to Mrs. Newell and a like amount to Mr. Sanford, and, after some other small bequests, the homestead and residue were left to Newell. Newnham was again named as executor. Soon after, Mrs. Rosa, by Mr. Newnham and Mr. Titus as her attorneys, began suit in the circuit court against Mrs. Newell for libel. This was tried in October, 1917, and resulted in a verdict for defendant. In this suit, Mrs. Rosa was examined and cross-examined at length, and it is claimed that her mental capacity to make a will is therein clearly evidenced.

On November 10, 1917, the testatrix deeded to Mr. Newell, by two separate conveyances, a considerable part of her real estate, reserving to herself a life estate in one of the parcels so conveyed. On the same day, a contract was executed by her and George B. Newell, wherein, after reciting that he had been "caring for and assisting her" and that she was desirous that he should continue to do so, he agreed "to care for and provide for and properly maintain" her for the remainder of her life, and in consideration thereof she should convey the lands described in said deeds to him. It was further agreed that the deeds and the agreement should be placed in the hands of Frank Newell, a brother of George, to be delivered on her decease, and that such delivery should transfer the title to George B. Newell, subject to the conditions contained in the agreement. These instruments were prepared by Mr. Newnham in his office but acknowledged before him and Frank Newell at her home in Kalamazoo. He claims to have received instructions to prepare them some time before when at her home. These deeds were placed on record on July 30, 1918, as Frank Newell says, at her request. The contract

or agreement was left with Frank Newell, no copy thereof having been given to her. Besides these facts which are, we think, undisputed, a large number of witnesses were called by both sides, who testified to circumstances bearing on the issues presented. Some of these will be further alluded to.

1. Mental Capacity. Under section 12546, 3 Comp. Laws 1915, the burden of proving mental incapacity is on the contestants. *In re Curtis' Estate,* 197 Mich. 473. We start out, therefore, with the presumption that the testatrix had sufficient mental capacity to make her will and that it expresses her intention as to the disposition she desired made of her property. Was such presumption sufficiently overcome by the proofs to justify the trial judge in submitting the question to the jury? To aid us in so determining, we may look at the terms of the will and the bequests made therein. While a testator may dispose of his property as he pleases, a consideration of the disposition so made is frequently an aid to the court and jury. The contestants were her sole heirs at law. They are each bequeathed but $10 out of an estate worth $16,000 to $18,000. The residuary clause reads:

"I give, devise and bequeath to George B. Newell all the residue of my estate of every kind and nature as he, the said George B. Newell, has been kind and attentive to me and has done more to help me and make my life happy than any other person."

The person named as executor was an attorney, living in Grand Rapids, whom the testatrix had met but a few times before the will was made. The will is brief and its terms easily understood by any person of ordinary mind and understanding.

The facts revealed by the proofs offered by contestants are most unusual. We have here a woman about 80 years of age so attracted to a man of 52 that she believes what he tells her about a niece, before that

time a favorite of hers, and submits to him the care and management of her property. While theretofore' bitterly opposed to the excessive use of intoxicants, she suffers him to become drunk in her home. Her manner of life becomes changed. From a tidy, modest, self-assertive woman, she becomes careless, if not unclean, in her person and dress, permits this man to appear before her nude and submits to the use of abusive language by him to her as though he were her lord and master. She permits him to kiss and fondle her while intoxicated, and tells one of her neighbors, who had formerly been in her employ, that if "she said anything to him he would get all the worse." She explains her neglect to call on a neighbor by saying she "would not dare to come when he was there." She told this same woman (Mrs. Boardman) in 1917 that "they had her sign some papers but she didn't know what they were. She said they had papers and she signed them and they had fixed things but she didn't know what was in it." The two wills were drawn by Mr. Newnham, an attorney of Grand Rapids, the first one when he was a stranger to her, and he was named by her as executor. When the one in question was prepared, the witnesses were two persons who lived outside the city, one of them, Mrs. Leaders, being an aunt of the first wife of George B. Newell, and the other, Mrs. Whipple, a lady who accompanied her. They both say the will was drawn that day by Mr. Newnham and all they recall hearing Mrs. Rosa say about it was "she wanted George to have everything she had, because he was the best friend she had ever had." They were both strangers to Mrs. Rosa. A neighbor, Mrs. Downs, who had for some time occupied one of Mrs. Rosa's houses, and who had at times written letters for her, testified as to many occurrences which tended to show mental weakness on her part after her illness in 1905 and

1906.   She became suspicious that those who came to her home were stealing things out of the house.   She also testified that prior to 1917 she had frequently heard Newell say to Mrs. Rosa that Mrs. Newell was a "bad woman," that she "had given him a disease," and on the witness afterwards asking Mrs. Rosa if she believed it she answered, "Why, he says so, it must be so," that the day the last will was drawn she saw Mr. Newell, Mr. Newnham, and a witness, Mrs. Herson, a friend to whom a bequest of $500 was made, on the back porch just after dinner time, talking together, that the next day Mrs. Rosa said to her, "I signed some kind of a paper yesterday that I don't know what it is," she said, "When George and that old judge get anything into their heads, there is nothing else to do."

There is plenty of testimony in the record tending to show that the deceased had sufficient mental capacity to make a will.   She transacted business at various times which indicated a perfect knowledge of what she was doing.   The testimony of her physician, Dr. Donald P. Osborn, is very persuasive.   Her testimony, given in her suit for damages against Mrs. Newell, inserted in the record, standing alone, would be convincing that she was mentally competent

While much that has been said in this review of the testimony may more particularly apply to undue influence, as was said in *Re McMaster's Estate,* 163 Mich. 210:

"It is apparent here that it is in fact impossible to wholly separate these issues."

In that case, it was also said:

"The will itself and the circumstances attending its execution lead one, naturally, to inquire:   *First,* whether Mrs. McMaster understood the effect of the instrument; and, if she did, *second,* what prompted her to give to Mr. Cooper nearly one-half of a con-

siderable estate, solemnly assigning as a reason therefor a fact which did not exist and could have been considered by her as existing only through misapprehension? The inquiries suggested were pursued at the trial with such result that the court, in my opinion, was required to submit to the jury the question whether undue influence had been exercised in procuring the will to be made, and, also, though I reach this conclusion with some hesitation, the question of the mental competency of the testatrix. Mental competency, in this case, includes ability to understand the meaning and effect of the residuary clause of the will and may involve, depending upon how the jury view the testimony, including the will itself, the ability to detect fraud, if fraud was attempted. Undue influence may be exerted to prevent the detection of fraud, may amount to fraud, may be strong enough to secure the provisions desired, although fraud is detected or suspected, and confidence may accept and may be relied upon to accept untruthful and fraudulent explanation. 1 Woerner's American Law of Administration, p. 44 *et seq.*"

If we apply the reasoning suggested by this quotation to the proofs here submitted, can we say as a matter of law that there was no testimony supporting the claim of mental incompetency and that the jury should have been so instructed? While impressed with the weight which we think should be given to the proofs offered by proponents, we feel constrained to answer this question in the negative and to say that there was sufficient evidence supporting contestants' claim to justify its submission to the jury.

2. Insane Delusion. The testimony offered by contestants tended to prove that the deceased had become possessed with the belief that her niece, Elizabeth, was an immoral woman. She stated to several persons that George had so informed her. Mrs. Newell testified that George denied saying any such thing to Mrs. Rosa; that he said, "The only thing I ever said about you was that you were a good woman and al-

ways good to me." If this be true, and George does not deny it, then it is apparent that Mrs. Rosa was under the influence of such a delusion. In addition to this, the fact is established that the deceased, after George began living with her and took charge of her affairs, conceived a violent dislike for her niece, whom she had theretofore treated with much affection. She evidently believed that Mrs. Newell had become unworthy of her continued regard. If such belief was founded on repeated false statements and insinuations made to her by George, so that her mind became obsessed with its truth and deluded into believing that which her lifelong acquaintance and close personal relations with her niece should have led her to reject, she might have been no less acting under a delusion. As was said by Chief Justice Shaw in *Woodbury* v. *Obear*, 7 Gray (Mass.), 472 (quoted approvingly in *Haines* v. *Hayden*, 95 Mich., at page 345).

"In the case of monomania and insane delusion, a person by artful, false, and repeated surmises and insinuations, operating upon a sensitive and excitable mind of another, may foster and exasperate, if not create, an insane delusion, and at the same time, and by the same means, obtain such an influence over him as to induce him to make a will, or do any other act which he would not have done but for the existence of the insane delusion, and the undue influence concurring with it."

The jury had also the right to consider, as bearing on this question, the language in the residuary clause of the will that George "has done more to help me and make my life happy than any other person." Whether this delusion, unfounded so far as the record shows by anything to support it, caused such an insane prejudice as influenced the deceased in the disposition of her property by her will, was a question for the jury to pass upon.

In his instructions to the jury, the court said:

"In addition to what I have said as to what constituted mental soundness, you are instructed that an insane delusion exists when a man or woman persistently believes supposed facts, which have no real existence, and so believes such supposed facts against all evidence and probabilities, and without any foundation or reason for the belief, and conducts himself or herself as though such facts actually existed."

He further instructed them that unless such delusion caused an insane prejudice against her niece and entered into and influenced her in the disposition of her property, and without which she would have disposed of it otherwise, then they should not on that account find for the contestants. We think the question was for the jury to pass upon, and that it was fairly presented to them.

3. Undue Influence. The rules of law applicable to a charge of this nature, and the proofs required to support it, have been so recently stated by this court in a number of cases that we but refer to them. *Haines* v. *Hayden,* 95 Mich. 332; *In re McMaster's Estate,* 163 Mich. 210; *In re Williams' Estate,* 185 Mich. 97; *In re Fay's Estate,* 197 Mich. 675; *Phelps* v. *Beard,* 209 Mich. 266.

It is urged that the omission of the testatrix to leave any considerable part of her property to the contestants is accounted for by the proceedings they had begun to have her declared mentally incompetent. This, however, in no way explains the fact that in the will made in 1916, before any such proceedings were had, and, so far as the record shows, before she had any reason for feelings of ill-will towards either of the contestants, she bequeathed to each of them but $500 and left the bulk of her estate to George B. Newell.

Counsel for proponents insist that *In re Weber's Estate,* 201 Mich. 477, is controlling on the question here presented. In that case, the will was drawn by a

reputable, disinterested attorney, whom the testatrix had sent for. The bequests are all to relatives, the residue being bequeathed to a sister and nephew. The contestant was a step-son, to whom she had willed but $50, and with whom her relations were strained. Mr. Justice BROOKE, who wrote the opinion, found that there was no evidence warranting the submission of the question of testamentary capacity to the jury and that—

"The will itself not only bears no internal evidence of undue influence but represents the natural and probable workings of a normal mind."

The distinction between that case and this is apparent. Here, the will was drawn by an attorney from another city, employed by George B. Newell to defend her in the probate proceedings. This comparative stranger is named as executor. The residue of the estate is left to one who is not a relative. The facts in these respects alone are so different as to render the opinion in that case of no controlling effect on the facts here presented.

The testimony, taken as a whole, clearly presented a case for the consideration of the jury. Witness after witness testified to the influence apparently exercised over this old lady by George B. Newell. The whole current of her life became changed after he came to live with her. No useful purpose will be served by cumbering this opinion with quotations from the record. We are satisfied that no error was committed in the submission of this question to the jury nor in the instructions of the court relating thereto.

4. Admission and Rejection of Testimony. Many errors are assigned under this heading. They are discussed in a general way by counsel. Their complaint is thus summarized in their brief:

"In fact, the history of Susan Rosa's life as viewed by the contestants was unfolded before the jury, all

to the disadvantage of the will which she had solemnly made."

The claim of the contestants was that the testatrix became much weakened both in mind and body during the period between her illness in 1905 and 1906 and the time when the will in question was made; that, otherwise, George B. Newell would not have been able to have exerted the influence over her which he did exert or have caused her to believe what he told her about her niece. The residuary clause in the will stated that he was the best friend she had ever had. These issues opened the door to a wide field of investigation by the jury as to her former life. We are of the opinion that there was no abuse of discretion in the admission of the testimony complained of. *Porter* v. *Throop,* 47 Mich. 313; *Haines* v. *Hayden, supra.*

Error is assigned upon permitting the physicians called by contestants to answer a hypothetical question asked them. The objection made was that "It calls for a conclusion without stating the facts." On being asked by the court what he claimed was omitted, counsel replied: "He does not state all the evidence in detail and all the facts and circumstances." It will serve no useful purpose to insert the question at length. It quite fairly stated the facts which had been testified to by witnesses for contestants, upon which they based their claim of mental incompetency. The doctors were cross-examined at length as to the reasons for the opinions expressed by them. A hypothetical question need not include all of the facts concerning which testimony has been given. The opinion of the witness may be taken on any combination of facts which counsel may believe the jury will find to be established by the proofs. As the answer depends on the truth of the facts stated, it would be an unfair rule to require counsel to include in the question all the testimony adduced or which he expected to ad-

duce. He need only include such as he feels satisfied will be accepted by the jury as true. 1 Wigmore on Evidence, § 682; 17 Cyc. p. 242 *et seq.; Rivard* v. *Rivard,* 109 Mich. 98.

The following language of the Lord Chief Justice in *Banks* v. *Goodfellow,* L. R. 5 Q. B. 549, quoted in *Rivard* v. *Rivard, supra,* seems peculiarly applicable to the entire case as made by contestants' proofs:

"Here, then, we have the measure of the degree of mental power which should be insisted on. If the human instincts and affections, or the moral sense, become perverted by mental disease; if insane suspicion or aversion take the place of natural affection; if reason and judgment are lost, and the mind becomes a prey to insane delusions calculated to interfere with and disturb its functions, and to lead to a testamentary disposition due only to their baneful influence,—in such a case it is obvious that the condition of the testamentary power fails, and that a will made under such circumstances ought not to stand."

After a painstaking examination of the entire record and a careful consideration of the exhaustive briefs of counsel, we are convinced that no reversible error is disclosed.

The judgment is therefore affirmed, with costs to contestants.

Moore, C. J., and Steere, Brooke, Fellows, Stone, Clark, and Bird, JJ., concurred.