*In re* MANN'S ESTATE.

VELDMAN *v.* MANN.

1. WILLS—EVIDENCE—ADMISSIBILITY.

In proceedings by a son to contest his mother's will in which she left the bulk of her property to her sister and a servant, where contestant had induced his mother to sign a letter to the trustee of a fund for her benefit under her husband's will, directing that all of the income therefrom above a certain amount be reinvested and added to the principal, two-thirds of which went to contestant upon her death, the trial court was not in error in refusing to strike out testimony by deceased's attorney as to statements made by him to contestant and the trustee of said fund while insisting on deceased's rights thereunder; said testimony being explanatory of or introductory to material evidence which followed.

2. SAME—ADMISSION OF FORMAL EXECUTION—INCOMPETENCY AND UNDUE INFLUENCE NOT AFFIRMATIVE DEFENSE ENTITLING TO OPENING AND CLOSING.

A statement by contestant's counsel that formal execution of the will was not denied, but that their affirmative defense was mental incapacity and undue influence, did not entitle them to the opening and closing under section 3, Circuit Court Rule No. 42, since the burden of proving the will is still upon proponent, and under the judicature act (3 Comp. Laws 1915, § 12546) the presumption of mental competency exists as in other cases, and it is not necessary for the proponent in the first instance to make any proof upon that subject.

3. SAME — TRIAL — INSTRUCTIONS — REQUESTED INSTRUCTION NOT WARRANTED BY RECORD.

Where no claim was made by proponent that contestant misappropriated any of deceased's funds or did not account as one of the trustees for all moneys of hers which came into his hands, the trial court was not in error in refusing a requested instruction that there was no

On effect of admission to change burden of proof and right to open and close, see note in 61 L. R. A. 513.

On burden of proof of testamentary capacity, see notes in 17 L. R. A. 494; 36 L. R. A. 733.

testimony that contestant ever withheld from his mother any money she was entitled to receive from her husband's estate, and that it was shown by all the testimony he faithfully accounted for all funds of hers that passed through his hands.

4. SAME—EVIDENCE—ADMISSIBILITY.

Where contestant produced his father's will and offered in evidence two paragraphs thereof relating to the trust funds provided for his wife, it was not error to admit the whole will, although it tended to show contestant's wealth, since it was competent as tending to show deceased's clear understanding of the situation when making her own will, in which she stated that contestant had been "abundantly provided for" in her husband's will.

5. SAME — WITNESSES — NON-EXPERT OPINION TESTIMONY AS TO TESTATRIX'S COMPETENCY.

Rulings of the trial court upon the question as to whether the proper foundation had been laid for opinion testimony of non-expert witnesses upon testatrix's mental capacity to understandingly make a will, *held*, without reversible error.

6. SAME—EVIDENCE—SUFFICIENCY.

Verdict in favor of proponent, *held*, sustained by the testimony.

Error to Muskegon; Vanderwerp (John), J. Submitted January 19, 1922. (Docket No. 6.) Decided October 2, 1922.

Frances Veldman presented for probate the last will of Sarah R. Mann, deceased. On the request of William H. Mann the will was certified to the circuit court. Judgment for proponent. Contestant brings error. Affirmed.

*Carpenter & Jackson* (*Norris, McPherson, Harrington & Waer,* of counsel), for appellant.

*Cross, Foote & Sessions* and *Macdonald & Macdonald* (*Willard G. Turner, Jr.,* of counsel), for appellee.

STEERE, J.    Sarah R. Mann, widow of Alexander
V. Mann, of Muskegon, Michigan, died June 4, 1920,
leaving an estate valued at about $100,000 and a
will executed April 30, 1912, with codicil added
April 6, 1914, naming executors in the place of
the two appointed in her will who had since died.
When the will was presented for probate her
son, William H. Mann, appeared and contested it
on the ground of undue influence and mental in-
capacity, requesting the probate court to certify the
contest to the circuit court of Muskegon county for
trial as authorized by statute.    This was done and the
case tried in the circuit before a jury, resulting in the
will being sustained.    Defendant brings the case here
for review on 32 assignments of error directed to
various rulings of the court in the progress of the
trial and certain portions of the charge.

Testatrix's husband, Alexander V. Mann, died in
1910.    His surviving heirs consisted of his widow,
Sarah R. Mann, their son, William H. Mann, and a
minor grandson, Earl McKelvie, son of a deceased
daughter.    Alexander Mann was an old resident of
Muskegon who had accumulated a large estate as
banker and lumberman, valued at approximately
$700,000, which he disposed of by a lengthy will
executed June 12, 1909, creating a number of trusts.
He appointed his son, William H. Mann, contestant
here, executor of the will, and a trustee with the
Michigan Trust Company of certain trusts which he
created.    Two trust funds designated Nos. 1 and 7
were for the benefit of his wife, Sarah R. Mann.    He
also gave her absolutely their large and valuable home
in the city of Muskegon with its contents of furniture,
pictures, silverware and other household effects, and
provided that for the first year after his death she
should receive from his estate $400 per month for
support and maintenance, which should not be charged

against any other provision made for her benefit. Trust fund No. 1 was to consist of $100,000 invested in safe interest-bearing securities, the net income thereof to be paid her during her life from time to time at her request, for her sole benefit. His son, William H., was given outright a fund of $100,000, his father's diamonds, jewelry and other personal effects, valuable real estate in Muskegon and other interests, constituting a generous share of the estate. Liberal provisions were made for two grandsons, Horace Mann, son of William H., and Earl McKelvie, son of a deceased daughter, all indebtedness owing testator at the time of his death by his son, William H. Mann, daughter, Eliza B. McKelvie, deceased, and other named relatives, was to be cancelled. Various bequests of proportionately modest amounts were given to relatives and for other purposes not necessary to detail.

Of the remainder, or residue, of the estate not specifically disposed of, one-half was given to his son, William H., and the other half was to constitute trust fund No. 7, to be held in trust "for my wife, Sarah R. Mann, during her lifetime," two-thirds thereof to go to William H. at her death and one-third to his son Horace after he attained a certain age. No direct provision was made for investment or payment of income from trust fund No. 7 to the widow during her lifetime, but it is claimed by contestant and not disputed that she was paid its income from time to time.

Alexander Mann was born in January, 1834, and went to Muskegon in 1857, where he engaged for many years in the lumber business. He was married to testatrix, Sarah R., in 1861. At the time of his death she was 77 years of age. Contestant, William H., was then a married man of middle age. For many years and until his death Alexander Mann and his

wife occupied as their permanent home the large dwelling he willed to her, which they had furnished and maintained appropriate to their circumstances, with domestic employees and caretakers.

Frances Veldman, a single woman 50 years of age at the time of the trial, had been a faithful and efficient employee in their home for many years, entered their service as a domestic when a young woman, and later "after their second maid left" became their working housekeeper. Her fidelity and efficiency was such that she was retained thereafter as the trusted caretaker and manager of their household affairs, until both died, being frequently in later years left by them in entire charge of the establishment when they were absent traveling and spending their winters in California or elsewhere. Alexander Mann left her $1,000 in his will if she remained in his employ to the time of his death and a further sum of $100 for each and every year and fraction of a year from the time she first entered such service. It was also shown by apparently disinterested witnesses that he had on various occasions spoken of her faithful long service, integrity and efficiency, expressing the intention to provide for her amply if she remained with them to the end, stating on one occasion that he had arranged it so his wife could do so if Frances continued with her as long as she lived.

Two years after his death his wife executed the will in contest here, the first paragraph of which is as follows:

"My son, William H. Mann, and his family and the child of my deceased daughter, Eliza Bonnell McKelvie, having been abundantly provided for in the last will and testament of my deceased husband, Alexander V. Mann, and mindful of the desires often expressed to me by my late husband in his lifetime, before and during his last illness, that I should not neglect the duty of making and executing a last will, and that he

would like to have me, if I survived him, provide in a substantial way for Mary J. Stevens, my sister, and Frances Veldman, my faithful servant and companion; and mindful of the love and affection which these two women have bestowed upon me and care with which they attend to my service and my affairs, I make, publish and declare this to be my last will and testament." * * *

With this introduction, she left her entire estate to the two women named in equal shares, except all her wearing apparel, clothing and jewelry, which she gave to her sister, Mary J., and a provision of $500 in cash to her grandson, Earl McKelvie, "as a remembrance of me and not for its value or because he needs it, his grandfather, my late husband, having amply provided for him by his last will and testament." Special reference is made in the will to her homestead, left with other real estate in equal interest to Mary J. Stevens and Frances Veldman, as to which she provided that they should keep and occupy the premises together as a home so long as they were content to do so, and lived together harmoniously, but when such was not the case the premises should be sold and the proceeds equally divided, while the furniture and other household effects should be divided between them equally if they chose, or sold and the proceeds divided.

During the ten years she survived her husband, testatrix resided in and kept up her old home with Frances Veldman as caretaker and housekeeper under her direction. After her husband's death some friction developed between her and William H., who, as executor of his father's estate and one of the trustees of funds provided for her income, assumed to dictate and control her personal affairs with scant regard for her rights and wishes, as she thought, insisting amongst other things that keeping up her home was all an unnecessary expense and that she break up

housekeeping, let Frances Veldman go and discharge an old employee of the family named Starkey, both of whom her husband told her to retain and which she insisted on doing.

In June, 1911, she signed a letter at her son's instance directing the Michigan Trust Company to send her a check for $400 each month, authorizing the balance of her income from trust funds Nos. 1 and 7 to be "added to the principal and re-invested according to the terms of the will." Had this been continued during her life it would not only have greatly reduced her income but profited William H. and his son, Horace, many thousand dollars, as by the terms of his father's will he would have received at her death an undivided two-thirds of trust fund No. 7, and his son the balance with all its increase on arriving at a certain age. Subsequently learning the import of this letter and claiming she had not understandingly signed it she took legal counsel and revoked the same, directing that the full income from her trust funds be paid directly to her. This was not done, however, until she filed a petition in the probate court and her attorney threatened further proceedings to obtain her rights in that particular. By reason of her son's unfair treatment of her and attempts to dictate her personal affairs as she thought and claimed, an estrangement grew up between them and with the assistance of legal counsel she thereafter managed her own money matters. Her grievances, summarized as proponent's evidence tended to show, are outlined in the testimony of F. H. Holbrook, a former postmaster and city official of Muskegon, who went to her home to witness her will. On that occasion he engaged in a conversation when alone with her, which he commenced by commenting upon the fact that her old home looked as pleasant as ever, the last time he was there being some years before at a party attended by many old settlers

since which Mrs. Mann's husband and his own wife had passed away; that in reply she commented upon the many changes and told of her sorrow over William H.'s treatment of her since her husband's death, saying that he had assumed to dominate her, kept funds from her, wanted her to discharge the woman who had been his father's nurse, had led her to sign a paper which prevented her from receiving certain money she was entitled to, treated her own sister, Mrs. Stevens, rudely when he saw her at the house, that she had found it necessary to take proceedings to protect herself, she had a good home and wanted to stay there but he to save expense wanted her to discharge her help, and other grievances of like import.

These charges are denied *in toto* by contestant, and his mother's attitude towards him after her husband's death imputed by him to her mental decadence and the malign influence of her maid-servant, Frances Veldman. To review at length the conflicting testimony on the issues of mental incapacity and undue influence would serve no beneficial purpose. That of contestant is to the effect his mother, even before his father's death, was not of vigorous mentality or independent thought, and after her husband's death her mental powers abated rapidly from sorrow and old age until with loss of memory and power of connected thought she became forgetful, credulous, entirely under the influence and control of Frances, and without understanding or mental capacity to intelligently manage her property or dictate her will, while that of proponent was to the effect she was a bright, intelligent woman of independent mind, active and well preserved for her age both mentally and physically at the time she made her will and up to shortly before her death. Illustrative of this conflict of testimony, Horace Mann testified of the situation and his grandmother's mentality in part as follows:

"After my grandfather's death Frances Veldman took care of my grandmother. For the first year after grandfather's death my father, William H. Mann, took care of her business matters. Frances Feldman was a maid—a house servant. * * * After my grandfather's death she (grandmother) never went out anywhere in any society. * * * She did not go on the streets or in any of the stores. She never went out alone. * * * When I came back during my vacations I visited my grandmother, had conversation with her. * * * She made no conversation herself. To my memory she never started any topic of conversation. * * * She never showed any independent ideas or opinions of her own on topics that were brought up. She never engaged in my presence in conversation or discussion of the current topics of interest, either local or broader. She didn't read any to my knowledge. Her memory was such that she had no ability to retain facts. * * * Her mental capacity I should say was that of a child of 8 or 10 years old. I know what this will is that is in controversy. * * * She did not have memory sufficient to remember what the nature and condition of her property was and the number and relation of those who were the natural objects of her bounty, or mental ability sufficient to consider these facts and from them make her will. * * * She did not appear to understand what she was doing. She could possibly have known what the papers were, but I do not believe she knew the purpose of the papers."

Mrs. Alice M. Wood, who was intimately acquainted with the family for nearly 50 years, testified in part:

"I was there very frequently. She came frequently to my house. I have attended parties there since Alec. died. They were afternoon parties for ladies. * * * Mrs. Mann visited with all of us. She went around among all her guests and made herself agreeable. * * * I think the last of those parties that I attended at her house was about three years ago. But two years ago she and I gave a party at my cottage at Lake Harbor. There were 32 ladies except one or two children. Mrs. Mann stood with

me and received all the people as they came in and she sat at a large table with a number of her specially old friends.    She visited with them all.  *   *   * When I have been to her house for supper, as I was occasionally, she read the evening paper aloud and she told me that was her habit every evening.  *   *   * I heard her read the paper and I heard her comment upon the topics of interest.    The comments were certainly intelligent.  *   *   *  I know Frances Veldman.    She was a housekeeper and Mrs. Mann always assisted in preparing the meals.  *   *   *  In my opinion Mrs. Mann in the year 1912 was mentally competent to make a will."

Mrs. Catherine Monroe, an old resident of Muskegon who had known Mrs. Mann since 1872 and frequently met her at social gatherings as well as in her own house, testified of a dinner party given by Mrs. Mann at her home in the summer of 1913, in part as follows:

"Mrs. Mann presided as hostess.    It was like a great many other dinners I had at Mrs. Mann's home. *   *   *  She was hostess, sat at the head of the table and served as she always did with grace.  *   *   * I had a great many conversations with her both before and after her husband died.    She was always the same to me.    I never could see any difference.    Perfectly rational in every way, and continued so as long as I knew her.    I knew Frances Veldman.    Her absolute devotion to Mrs. Mann and her great care of her impressed me always.    On the occasion of the dinner that I have spoken of she took the part that any person in her station naturally would take.    Mrs. Mann managed everything and Frances served the dinner beautifully.  *   *   *  I never saw anything with Mrs. Mann to indicate that she was not perfectly competent to make a will or do anything else she wanted to."

There is abundance of testimony also that she looked after her business affairs intelligently, kept track of what her money went for, paid with checks which she signed, repaired and redecorated her house, maintained her home as before her husband's death, took

an interest in church matters and charitable organizations, contributing to several as they had been accustomed to do while her husband was living, and, advising from time to time with her attorney, made judicious investment of her surplus funds. Her attorney testified that on an occasion when she was advising with him she broached the subject of making a will, told what her husband had said to her about it and stated what she wanted put in her will, which she directed him to prepare; that he made a draft of what she said she wanted in her will at his office, which he submitted to her and she read over, that corrections were made as she desired with new drafts until it was satisfactory to her as carrying out her own and her husband's desires; she proposed the name of one of the executors, who she said lived near by and was an old friend of the family in whom she had confidence and selected the other from a number of names mentioned by him; that when the will was as she wanted it he took Mr. Holbrook up to the house to be a witness, leaving him there with Mrs. Mann while he went after another witness, and after the will was duly executed she left it with him for safe keeping and after both of her executors had died she sent for him to draw a codicil naming others. As to his professional work for her he said: "I never received any directions or instructions from Frances Veldman. Nobody directed me but Mrs. Mann. * * * I had nothing to do with anybody else."

Error is assigned on refusal of the court to strike out the testimony of this witness as to statements made by him to contestant and the Michigan Trust Company when insisting on Mrs. Mann's rights under her husband's will. Those statements were in connection with his account of the difficulties encountered in getting from those trustees money she was entitled to under her husband's will, after revoking the letter

219—Mich.—45.

curtailing her income as related, leading up to a compromise by which she thereafter received from the trustees $500 per month and the balance of the income from trusts Nos. 1 and 7 at the end of each year. His lengthy narrative on that subject might well have been curtailed by the court in various other unimportant details had objection been made at the time, but this was in its nature explanatory of or introductory to material evidence which followed, and we cannot say that refusal to strike it out at the time the motion was made amounted to prejudicial error.

At commencement of the trial a contention arose between counsel as to who was entitled to the opening and closing. Contestant's counsel stated formal execution of the will was not denied, their affirmative defense being mental incapacity and undue influence, which entitled them to the opening and closing under Circuit Court Rule No. 42; while counsel for proponent urged that the burden of proving the will was put upon them by statute and no court could admit a will to probate except upon due proof as the statute requires, that proof could not be waived by a contestant and defendant could only be heard after a *prima facie* case was made. The trial court held the rule relied upon did not apply and denied defendant's request for the opening and closing, which it is insisted was prejudicial error.

Tested by the rule that the party against whom judgment would go if no evidence were introduced, the proponent of a will has the opening and closing. Counsel for contestant urge that their admission of formal execution of the will brings the case directly under section 3 of Circuit Court Rule No. 42, which is as follows:

"Whenever, in an action, the defendant, by notice accompanying his plea, waives the benefit of the general issue and admits the facts alleged in the plain-

tiff's declaration, but attempts to defeat the plaintiff's recovery by set-off or by recoupment, or by affirmative defense which, if true, defeats plaintiff's recovery, such defendant shall have the opening and closing in the taking of testimony and in the argument on the trial of the cause."

This section is the same as subd. "*c*" of former Circuit Court Rule No. 24, and clearly could have no application to will contests prior to adoption of the judicature act, which provides that in probation of wills the presumption of mental competency exists as in other cases and it is not necessary for the proponent in the first instance to make any proof upon that sub- ject (3 Comp. Laws 1915, § 12546), which changed the previous holding of this court that the burden of prov- ing mental capacity in will cases rested upon the pro- ponent, contrary to the great weight of authority in other jurisdictions. *In re Curtis' Estate,* 197 Mich. 473. This left will contests in no better position than ordinary actions at law under section 3 of Rule 42, conceding that said section is applicable. In *Kincade* v. *Peck,* 193 Mich. 207, which was an appeal from justice's court in which counsel for defendant claimed the right to open and close, under subd. "*c,*" Rule 24, it is said:

"If the rule could be applied to cases so begun, the defendant did not, by notice accompanying the plea, waive the benefit of the general issue and admit the facts alleged in plaintiff's declaration."

This question was raised in the recent case of *Murray* v. *Noon, ante,* 70, where contest was made, as stated in the notice of appeal from the probate court, on the grounds the writing was not the will of Patrick Murray, mental incompetency and undue in- fluence. Upon the trial counsel for contestant con- ceded that the will was signed by Patrick Murray and had been formally executed according to statute,

and stated their only grounds of contest were undue influence and mental incompetency, requesting the right to open and close, which was refused. It is there said:

"The court was right in refusing the request. That the rule would be otherwise had the reasons for appeal been limited to either the second or third reasons given or to both we need not here determine. Nor need we determine whether a ruling if erroneous would constitute reversible error."

In terms section 3 of Rule 42 only applies to actions where defendant by notice accompanying his plea waives the benefit of the general issue and admits the facts alleged in plaintiff's declaration. If by analogy we take the petition for probation of the will as a declaration and notice of contest, or petition to certify the cause to the circuit court, as a plea waiving the benefit of the general issue, the contestant should by notice accompanying the same admit the facts alleged in the petition for probation of the will which sets out its due execution in detail, and alleges:

"Said deceased, at the time she executed the will, was 21 years of age and upwards, and was of sound mind and under no restraint or undue influence whatever."

There was not even an admission in writing of formal execution of the will. The oral statement of counsel at the trial that they had not and did not deny the formal execution of the instrument proposed for probate and did not dispute the *prima facie* case of plaintiff was not a compliance with the rule invoked. In 26 Ruling Case Law, p. 1024, it is noted that some courts have said the right to open and close is an important one but:

. "The prevailing view is that the right to open and close is a mere question of trial practice, and that a ruling of the trial court is not a proper subject for

an exception, or, as some courts put it, there will be no interference by an appellate court unless there is evidence of an abuse of discretion. Where it cannot be seen that a party was prejudiced in being denied the right to open and close, the ruling of the trial court will not be disturbed."

We are not prepared on this record to find an abuse of discretion or that contestant was prejudicially denied a vested right.

Serious complaint is made of refusal by the court to charge, as requested, that there was no testimony William H. ever withheld from his mother any money she was entitled to receive from her husband's estate, and that it was shown by all the testimony he faithfully accounted for all funds of hers that passed through his hands. We find no claim in this record that he misappropriated any of her funds or did not account as one of the trustees for all moneys of hers which came into his hands. The complaint against him was his attitude towards her in connection with the curtailment of her income for a time to swell by its earnings during her life the trust fund of $200,000 which he would eventually participate in as before related. In the answer of the Michigan Trust Company to a petition she filed in the probate court the situation is stated in part as follows:

"This respondent, further answering, says that during the two years which this respondent and its co-trustee, William H. Mann, have been administering trust fund No. 7, they have paid a part of the net income of said trust fund to petitioner, as shown by their first and second annual accounts. These payments were made by direction, and on the authority of said William H. Mann, who, by the terms of the 19th paragraph of said will, is the remainderman of two-thirds of said trust fund No. 7. The surplus net income during the first year of such administration was re-invested by the trustees by direction of the petitioner."

Contestant produced the will of Alexander V. Mann and offered in evidence two paragraphs relating to the trust funds provided for his wife. Opposing counsel urged the whole will should be admitted if any part of it was, and the court so ruled. This ruling is urged by appellant as error because it prejudicially tended to show his wealth by incompetent evidence as we gather from his counsel's brief. Apparently in that connection particular complaint is also made of the court permitting his cross-examination in relation to some Canadian timber lands, worth $100,000, which Alexander V. Mann and his wife had deeded to him some time before the elder Mann's will was made, the contention being that it was done to emphasize his wealth as compared with that of the beneficiaries under his mother's will, and was prejudicially so used, against objection, by proponent's counsel in his address to the jury. While the comparative financial circumstances of the opposing parties may not be material or competent as a rule of evidence in the abstract, we think the will was admissible for the purpose for which it was offered and used. The Canadian timber land was deeded in escrow to contestant by his parents in 1908, the deed being delivered to the National Lumberman's Bank for delivery to William H. Mann after his father's death. The facts are set out in his father's will in a paragraph beginning "I wish it understood that—." This was necessarily known to Mrs. Mann, who had conveyed to William H. her dower in these lands, as were also other provisions his father made for him. It was competent as tending to show her clear understanding of the situation when making her own will in which she stated that William H. had been "abundantly provided for" in the will of her husband. In *Stevens* v. *Hope*, 52 Mich. 70, it is said:

"Such facts, in regard to testator's fortune and the

circumstances and relations of his family within his knowledge as would naturally influence him in respect to his testamentary dispositions, were proper to be considered."

Many of contestant's assignments of error relate to the court's rulings along the boundary line of that often troublesome question of whether the foundation is sufficiently laid for opinion testimony of non-expert witnesses upon testatrix's mental capacity to understandingly make a will, often involving technical niceties which are of little interest and seldom of much help to a jury in arriving at a verdict. Rulings of the court upon that line of objections were impartial and for the most part correct. In the light of the testimony taken on that subject we find no error demanding reversal.

This case is in its outstanding and controlling issues essentially one of facts for determination by a jury. The court fairly submitted those issues to them with correct instructions as to the rules of law by which they should be governed, in a plain and clear charge easily understood. There was abundance of direct and convincing testimony to sustain the verdict given, which, after a careful examination of all the evidence both written and oral, we find no occasion to' disturb.

The judgment will stand affirmed.

FELLOWS, C. J., and WIEST, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.

The late Justice STONE took no part in this decision.