*In re* SCHOLTEN'S ESTATE.

1. WILLS—WITNESSES—EVIDENCE—EXCLUSION OF WRITTEN STATE-
MENT NOT ERROR WHERE WITNESS ON STAND.

In a will contest case, where counsel for contestants had,
before the trial, procured from the attending physician,
who was also a witness to the will, a written statement
as to what occurred when it was executed, in view of the
fact that said witness was on the stand and disclosed
wherein said statement differed from his present recol-
lection, its exclusion was not reversible error.[1]

2. SAME—MENTAL COMPETENCY—WITNESSES—APPEAL AND ERROR.

Sustaining an objection to a question asked testatrix's
son as to whether his mother was mentally competent to
execute said will, on the ground that he had not shown
that he knew what degree of mentality was required
therefor, was not reversible error, in view of the fact
that he was later allowed to answer the question when
it was so framed as to show the degree of mentality
required.[2]

3. SAME—FRAUD—TRIAL—INSTRUCTIONS.

Objection that the charge of the court entirely withdrew
from the jury the question of fraud, *held*, not sustained
by the record.[3]

4. SAME—TRIAL—INSTRUCTIONS—REPETITIONS NOT PREJUDICIAL.

Objection that the trial judge, by repetition in his charge,
so emphasized certain questions as to prejudice contest-
ants' case, *held*, not sustained by the record, which shows
that the repetitions were not all on one side, and that
contestants, by their numerous requests to charge, were
partly responsible for the repetition of which complaint
is made.[4]

Error to Kent; Brown (William B.), J. Submitted
October 20, 1925. (Docket No. 99.) Decided De-
cember 22, 1925.

[1]Appeal and Error, 4 C. J. § 2994; [2]Id., 4 C. J. § 2999; [3]Wills,
40 Cyc. p. 1337; [4]Appeal and Error, 4 C. J. § 3021.

Catherine Scholten presented for probate the last will of Ellen Scholten, deceased. The will was allowed in the probate court and Jacob Scholten and others appealed to the circuit court. Judgment for proponent. Contestants bring error. Affirmed.

*Jewell, Face & Messinger,* for appellants.

*Linsey, Shivel & Smedley,* for appellee.

MOORE, J. This case is a will contest in which the will was sustained. The case is brought into this court by writ of error. Ellen Scholten was 65 years of age. Her husband had died some years before. She had 8 living children, the youngest of whom was Catherine, who was 25 years old, and who lived with her mother in the house of her brother who was the oldest of the children, and was a bachelor. All the other children were married and had homes of their own. Mrs. Scholten was taken ill Friday evening. Saturday forenoon a doctor was called, who found her suffering from pneumonia. A Catholic priest was called Saturday morning, who administered the Catholic rite of sacrament. Sunday forenoon Mrs. Scholten made the will which is the subject of this litigation. It is a very short will. Omitting the formal parts it reads:

"2. I give and bequeath to my dear daughter, Catherine Scholten, all the personal property of which I may die possessed. This is to include all money I have in any bank, money owing to me on mortgage or any other personal property of whatsoever nature. This is given to my daughter as part payment for services she has rendered for me during my lifetime and because I am greatly indebted to her for care and attention she has given me for many years.

"3. It is my will that my daughter, Catherine Scholten, be made the executrix of this my last will."

Mrs. Scholten's estate was valued at from $2,000 to

$4,500.    The contestants are all of her children except Catherine.    The will was presented to Mrs. Scholten by her attending physician, who testified that it was given to him Sunday morning by a young man by the name of Witte, to be taken to Mrs. Scholten to be executed.    The doctor testified in detail to its execution, as did the other witness to the will.    Mrs. Scholten signed the will by making her mark.    Mr. Witte testified that he procured a lawyer to draft the will at the request of Mrs. Scholten.    Mr. Witte had been attentive to Catherine Scholten for some time, and it is the claim of contestants that Mrs. Scholten was not competent to make the will, that she never in fact did make it, and that if she did sign the paper she was unduly influenced to do so.    At the close of all of the testimony the proponent asked for a directed verdict.    This motion was overruled, the case was submitted to the jury with the result already stated.

Counsel for the contestants had, before the trial, procured from the doctor a statement as to what occurred when the will was executed, and complain because they were not allowed to introduce that paper in evidence.

It may be well here to quote from the record:

"*Q.* Then after you had talked with Judge Jewell and myself in regard to the executing of this will, you later had another conversation with Judge Jewell alone about it, did you not?

"*A.* Yes, sir.

"*Q.* And at that time you signed a statement in regard to the facts of the case?

"*A.* I don't remember that I had.

"*Q.* (Showing witness paper.)    I will show you this paper and ask you if you remember that?

"*A.* This is with the corrections I made, yes, sir.

"*Q.* And these changes that appear here in pen and ink you made with your own hand, did you not?

"*A.* Yes, sir.    I notice that I said Miss Scholten gave it to me, but I was mistaken at that time.

"*Q.* Now, at the time you signed this paper, doctor, you had thought the thing over a little more extensively, had you not?

"*A.* Yes, sir.

"*Q.* And at the time you signed this paper you made certain changes so that it would conform to the facts as you then remembered them?

"*A.* Yes, sir.

"*Q.* Doctor, you did not keep any notes or memorandums of these facts, did you?

"*A.* No.

"*Q.* You had nothing to rely upon except your own memory?

"*A.* Own memory and what as one gets to recall things, you know, as you step into a certain place and you happen to remember well that something did happen here, that things would come back to you.

"*Q.* And have you talked with any one else about it to refresh your mind?

"*A.* Only at the time the testimony was given at the last—when the will was first probated.

"*Q.* Have you talked with Mr. Linsey about it?

"*A.* No, only as I talked with you folks.    He came to me in the same way that you came, to talk the matter over with me.

"*Q.* Have you talked with Miss Witte about it, Hilda Witte?

"*A.* Just mentioned that at the hospital and that is when I remembered that her brother had given it to me at the hospital.    When I went into the hospital I remembered that.

"*Q.* So that it is somewhat with the aid of other people that you have been able to recall?

"*A.* Yes, sir.

"*Q.* The facts as you now recall them?

"*A.* Yes, sir.

"*Mr. Face:* I would like to introduce this in evidence.

"*Mr. Linsey:* Let me see it.

"*Mr. Face:* I want to offer it first.

"*The Court:* Well, it would not be admissible unless there is something in his testimony that contradicts it.    You can ask him and if he does not dispute that paper, then the paper is not admissible.

"*A.* I have just disputed one statement in it.

"*The Court:* Are you disputing it or correcting it?

"*A.* I am correcting it.

"*Mr. Face:* It bears his signature, and that he signed it and compared it.

"*The Court:* You can ask him about it. If he states he now signs the paper as you have it, it won't change his testimony. If he says he did not say that, then the paper would be received for impeachment.

"*Mr. Face:* Well, the purpose of it now is, of course, to impeach the witness' memory of the facts.

"*The Court:* Maybe he will answer if you ask, that he did that the same.

"*Q.* Well, you did sign this paper?

"*The Court:* No, he says he signed it; I mean the substance of the paper. You ask him if he did not say a certain thing. If he admits it, you don't have to offer the paper. If he denies it, you can then offer the paper.

"*Mr. Face:* Very well.

"*Q.* Well, Dr. Veenboer, you did state in this written statement, did you not, that on the 17th day of May, 1924, you were called to attend Ellen Scholten, the deceased here, at her room in the house of her son in Grand Rapids; you stated that?

"*A.* Yes, sir.

"*Q.* That you saw her on Saturday, May 17th, and again on Sunday, May 18th?

"*A.* Yes, sir.

"*Q.* You stated that. That she was taken suddenly ill on Saturday morning and died on Monday morning, May 19th?

"*A.* Yes, sir.

"*Q.* That is part of your statement, it is, and see, did you make this statement: 'I called there during the forenoon of Sunday, May 18th, and Hilda Witte, a nurse, was there at the same time. Miss Witte and I went together into the bedroom where Mrs. Scholten was lying in bed. Mrs. Scholten's daughter Catherine Scholten, went into the bedroom with us and shut the door as soon as we got in. There were other children of Mrs. Scholten in the parlor and other parts of the house, but the daughter Catherine did not ask them into the bedroom and closed the door after we went in.'

"*A.* That is right.

"*Q.* You made that statement did you?

"*A.* Yes, sir.

"*Q.* See, did you make this statement: 'Catherine Scholten produced the paper which had been drawn up to be executed by Mrs. Scholten as her will;' did you make that statement?

"*A.* I made that statement, but I was in error.

"*Q.* When Catherine Scholten, the daughter, produced the paper, she said 'this is the will my mother wants to make, and there has to be two witnesses and I would like to have you and Miss Witte act as witnesses.' You made that statement at that time?

"*A.* I suppose I did; but I probably was in error at that time too, because I remember now quite distinctly that I took the paper from the hospital.

"*Q.* Did you make this statement: 'The paper had been written in longhand in pen and ink and was already prepared and completed except the signatures when it was shown to me?

"*A.* Yes.

"*Q.* And that is true, is it not, that the paper was completed before you ever saw it, except as to signatures?

"*A.* Yes, that is right.

"*Q.* 'I read the paper aloud to Mrs. Scholten in the presence of Miss Witte and the daughter;' that is a correction which you made to this typewritten paper, is it not?

"*A.* Yes, that is the paper that you prepared.

"*Q.* And that is the statement you made?

"*A.* Yes, sir.

"*Q.* 'She was unable to write her name and made her mark on the paper and Miss Witte and I signed it as witnesses?'

"*A.* Yes, sir.

"*Q.* You made that statement?

"*A.* Yes, sir.

"*Q.* 'I did not examine her carefully as to her mental condition at that time and was not requested to do so.' You made that statement did you not?

"*A.* Yes, sir.

"*Q.* 'Mrs. Scholten did not say anything to me about a desire to make the will when I saw her the day be-

fore, and I was not consulted by anybody regarding the same until it was signed;' you made that statement, did you?

"*A.* Yes, sir.

"*Q.* 'I never saw the paper until it was produced by Catherine Scholten, Mrs. Scholten's daughter, after we went into Mrs. Scholten's bedroom that Sunday afternoon,' you made that statement?

"*A.* That was the error that I made.

"*Q.* Now this statement as it is now contained here over your signature, is it true, or is it not true?

"*A.* It is not true.

"*Mr. Linsey:* Well, I ask to have that stricken out, that question.

"*The Court:* Well, it may be stricken, I understand the witness to say that parts of it are true, parts of it are correct and other parts are not correct, and he has attempted to correct those that are not correct according to the witness' views.

"*A.* I have better means now of knowing what happened there at Mrs. Scholten's home that day than I had at the time I made this statement. They consist of people reminding me that this happened so or that happened so. My going to the hospital and suddenly remembering that, why, there is where Mr. Witte gave me that paper. That is how I remember that.

"*Q.* Who has done this reminding you that it happened so-and-so?

"*A.* Talked with Miss Witte about the people when I went to the hospital. I said 'wasn't that given to me by your brother here' something to that effect, and she told me that it had been given to me there. As a matter of fact, my own independent and unaided memorandum of the facts that occurred over there, the transactions that occurred is not very vague.

"*Q.* It is quite vague is it not?

"*A.* No, not quite vague; somewhat vague, probably.

"*Q.* And without being prompted or having your memory refreshed about it by others, you would not be able to swear definitely as to what happened there, would you?

"*A.* Well, if I could fix the thing in my mind and they said it, and it would read with what came back to me, then I would say those things were right.

Without that assistance I would not be able to swear definitely to everything that happened.

"*Mr. Face:* If the court please, I would not (now) like to offer in evidence the statement.

"*Mr. Linsey:* I object to it as being immaterial.

"*The Court:* It is.    The objection is sustained, I will add to the reason for the ruling also, the paper is incompetent as well as immaterial."

It will be noticed that the examination of the witness disclosed wherein the written statement differed from his present recollection of what occurred.    We do not think its exclusion was reversible error.    Jones on Evidence (2d Ed.), p. 1084.

Counsel claim that the court erred in sustaining the objection to the following question put to Herman Scholten:

"*Q.* Now, I will ask you whether or not at the time you mention at 11:30 in the forenoon on Sunday, on the 18th of May, 1924, in your opinion your mother was mentally capable, mentally competent to execute this instrument which is produced here?"

We again quote from the record:

"*Q.* Now I will ask you whether or not at the time you mention at 11:30 in the forenoon on Sunday, on the 18th of May, 1924, in your opinion your mother was mentally capable, mentally competent to execute this instrument which is produced here?

"*Mr. Linsey:* Just a moment.    I object to that. He has not shown that he knows what is required. It is a different rule when you come to show a person is incompetent than it is when you show they are competent.

"*Mr. Face:* If the court please, I think any layman knowing the facts can answer the question.    They don't have to be experts.

"*Mr. Linsey:* But they must know what degree in law of mentality a person must possess to make a will, and he has not shown that he does at all.

"*The Court:* Well—

"*Mr. Face:* I don't understand that there is any

different rule between the witness who testified that
a person is competent and a witness that testifies he
is not competent.

"*Mr. Linsey:* There is.

"*Mr. Face:* The same rule applies to both, except
as I understand in this State the subscribing witnesses
to a will, who have a different rule applied to them.

"*The Court:* Of course the rule as to making a will
as to the competency of the testator is that they shall
have sufficient mentality to appreciate and hold in
mind who are the natural objects of their bounty as
well as to appreciate and hold in mind at the same
time the nature and extent of their estate.

"*Mr. Face:* That is another question which may
be put to the witness and which I propose to put to
the witness before I get through.

"*The Court:* Well, the witness may not know what
that rule is, and that is the rule, and I think that the
question should be put in that way.

"*Q.* Well, I will ask you this then, witness, whether
or not, at the time we have just mentioned, in your
opinion, your mother had the mental capacity such as
to enable her to understand the extent of her property,
her relations to others who might or ought to be the
objects of her will, and the objects of her bounty, and
to understand the scope and bearing of the provisions
of this will and had a sufficiently active memory to
collect in her mind without prompting, the elements
of the business to be transacted, and hold them in
her mind a sufficient length of time to perceive their
obvious relations to each other and form a rational
judgment in relation to them; now that is the rule?

"*The Court:* Yes.

"*Q.* Now, did your mother have that mentality?

"*A.* She did not have."

The ruling was not reversible error.    See *Kempsey*
v. *McGinniss,* 21 Mich. at p. 144; *Page* v. *Beach,* 134
Mich. 51; *In re Morse's Estate,* 146 Mich. 463.

Counsel claim the court erred in withdrawing en-
tirely their claim of fraud.    We quote from the
charge:

"Undue influence is not exercised openly.    It is a

species of fraud, and, being a species of fraud, works secretly in order to accomplish its improper purpose. It is largely a matter of inference from facts and circumstances surrounding the testator, his character and mental condition as shown by the evidence and the opportunity possessed by the beneficiary for the exercise of such control.   *   *   *

"If you find that a scheme was made and carried out by Catherine Scholten and Anthony Witte, or either of them, at the instance of Catherine, whereby the deceased was induced to sign this instrument at a time when she was weak in mind and body, stupefied by disease, and under conditions such that she was unable to hear or appreciate or understand what she was doing or what the instrument provided, and if such a scheme was carried out and this instrument was executed under those circumstances, then this instrument is not her last will and testament.   *   *   *

"Undue influence may be proved by other than direct testimony, that it has been exerted.   The circumstances disclosed by the will itself and the manner of procuring it to be made may raise the presumption that undue influence has been exercised."

We quote from the brief of counsel:

"Let it be understood that we are not, in this division of the brief, complaining of the substance of the propositions as stated but to the argumentative method so plainly resorted to by the court.   When the court had given his 40th instruction he had certainly pointed out to the jury the burden which was on the contestants as strongly and forcefully as the proponent could expect and as strongly as proponent was entitled to.   The action of the court thereafter in covering the same proposition again and again in almost the same identical language must either tend to confuse the jury or to magnify the importance of that part of the instructions out of all fair proportion.   *   *   *

"But the strongest argument against the instructions in this case is the reading of them.   As we read these instructions over and note the continually increasing momentum in favor of the proponent with only here and there a fragment favorable to the contestants, we do not see how the jury after hearing the in-

structions given vocally could possibly have found that fraud or undue influence had been proven unless the witnesses testified to acts of physical brutality and direct threats of violence.    The rhetorical effect of this continued repetition of the same thought is practically irresistible when coming from a presumably impartial and disinterested source.    We have heard some very effective arguments made by counsel, the chief strength of which was the continued repetition and pounding upon the same idea.    The court by this method magnified the difficulties of the contestants in proving undue influence to such size as to overshadow, if not entirely obscure, every other element in the case.    Indeed the court does not in express words tell the jury that they must not find undue influence in the case, but will anyone assume to be so wanting in discrimination as to doubt the actual effect of these instructions in a court?

"We do not wish to be understood as reflecting upon the sincerity of the court.    We know his earnest allegiance to his principles and his duty fully, but we do insist with positive conviction that his instructions in this case had the effect of denying the contestants an impartial trial, and that if he believed that their case should not be submitted to the jury on a proper basis the court should have directed a verdict giving contestants the benefit of specific exception."

In this connection it should be stated that counsel for contestants presented 21 requests to charge, each one of which was of considerable length, so that they take up nearly 8 pages of the printed record.    The trial judge in his effort to cover every phase of the case, charged the jury at such length that his charge covers more than 20 pages of the printed record.    It goes without saying that in a charge of such length in so simple a case as the one before us, there will be many repetitions, but this occurred many times in stating the claim of contestants, as well as in stating the claim of the proponent.    We do not find that the court invaded the province of the jury, but on

the contrary that he left it to them to say what the pivotal facts were.

We have examined the other assignments, but find no occasion to discuss them. See *In re Weber's Estate*, 201 Mich. 477; *In re Mann's Estate*, 219 Mich. 695; *In re Morris' Estate*, 228 Mich. 555, and the cases cited therein.

Judgment is affirmed, with costs to the appellee.

McDONALD, C. J., and CLARK, BIRD, SHARPE, STEERE, FELLOWS, and WIEST, JJ., concurred.